SUSAN E. CHANDLER & another *vs.* WILLIAM L. BAKER, administrator.

Norfolk.   January 8, 1906. — May 17, 1906.

Present: KNOWLTON, C. J., MORTON, LATHROP, HAMMOND, & SHELDON, JJ.

*Contract,* Implied: Common counts.   *Damages.   Evidence.*

Where services are rendered under an understanding of both parties that they are to be paid for but no amount or manner of compensation is agreed upon, the recovery for the services can be only upon a *quantum meruit* and the basis of compensation is the reasonable value of the services, not what the plaintiff supposed he was to receive or what he might have had reason to expect.

In an action against an administrator for compensation for personal services in giving up the plaintiff's home and occupation, entering the family of the intestate, caring for him and his household, entertaining him and making his home pleasant during his lifetime, under an understanding of both parties that the services were to be paid for but with no agreement as to the amount, the valuation placed upon the services by the parties, especially by the party to whom they were rendered, although not the measure of damages, may be considered as evidence in determining what the services reasonably were worth.

HAMMOND, J.   This is an action of contract tried before a justice of the Superior Court sitting without a jury. The *ad damnum* of the writ was originally $50,000, but after the entry of the action it was changed by permission of the court, on motion of the plaintiffs, first to $100,000, and afterwards to $200,000. The original declaration was in three counts, of which the first was on an account annexed for services rendered to Albert S. Bird, the defendant's intestate, from October 1, 1897 to February 25, 1903; the second was on *quantum meruit* for labor performed and services rendered to the defendant's

intestate for the same time; and the third alleges that in September, 1897, Bird entered into an agreement with the plaintiffs by which, in consideration that the plaintiffs would give up their homes and their occupation and enter his family and care for his household and for himself during his lifetime, he would pay to the plaintiffs such sums as their services were worth; that in pursuance of this agreement the plaintiffs did give up their homes and their occupations and entered into the family of Bird on or about October 1, 1897, and devoted their whole time, energy and strength to the care of Bird and his household until his death, which occurred on February 25, 1901. In each count the sum sought to be recovered was named as $100,000. The declaration was subsequently amended by changing the amount sought to be recovered in each count from $100,000 to $200,000; and by the addition of a fourth count in which it was alleged that in September, 1897, Bird entered into an agreement with the plaintiffs by which in consideration that the plaintiffs would give up their homes and occupations and enter his family and care for his household and for himself during his lifetime he would pay to the plaintiffs a sum not less than $200,000, for their services; and the plaintiffs, in consideration of this promise, did give up their homes and occupations and enter his family and care for his household and for himself during his lifetime, and thereby became entitled to receive from the defendant as administrator the sum of $200,000. The defendant's answer as amended admitted that the defendant was the administrator, contained a general denial, and pleaded payment and the statute of frauds.

At the conclusion of the evidence the defendant made seven requests for rulings, all of which, except the third, were refused; and there was a finding for the plaintiffs for the sum of $102,169.50. The case is before us upon exceptions taken by the defendant to these refusals.

Many of the facts seem to be uncontroverted. In September, 1897, Mr. Bird, then about fifty-seven years of age and apparently not in robust health and not actively engaged in business, was living where he had been living for several years, in good style, in a commodious house in Brookline. His wife had died a year before, and there was no one except ser-

vants to look after the house ; and the cook, whom he had had
in his employ for some years, was getting discontented and had
threatened to leave " unless some one who was able to take care
of the house came right away." In this gloomy crisis in his
household affairs he began to think of help and companionship,
and in this connection his mind turned toward the plaintiffs,
who were then living in a moderate home in Plymouth. They
were distant relatives of his wife, and during her life had been
frequent visitors at his house. Susan was earning about $600 a
year in teaching music, and Mary about $400 as a teacher in
one of the public schools of Plymouth. Bird visited them there,
and, stating the condition of things in his house, asked them to
come and be members of his household. They at first declined,
but after a conversation the precise tenor and legal effect of
which is in dispute, they agreed with him to come ; and about
October 1 of the same year they came to his house and stayed
there until his death in February, 1901. They came not as
servants, but as members of his household and upon social
equality with him. They took charge of the household affairs,
giving directions to the servants, and, by reading aloud to and
driving with him, playing on the piano, talking with him, and
in many other ways looking after his comfort, did what they
properly could to care for him and entertain him and make his
home pleasant. While not in robust health he does not seem to
have had any serious illness until November, 1900. Everything
seems to have been pleasant and both he and the plaintiffs were
satisfied. From time to time he made them presents of per-
sonal estate, and he made to Susan a deed of land with a house
thereon situated on Cypress Street in Brookline, worth perhaps
$9,000. During this time he had horses, carriages and a coach-
man, and was worth perhaps $200,000 or more. He drove out
often, almost always accompanied by the plaintiffs. We do not
understand that the defendant contends that the plaintiffs did
not do their duty, or that Bird did not receive all the care and
companionship that he could reasonably expect, or that he was
not perfectly satisfied. The plaintiffs testified that they were
pretty closely confined to the house, especially in the evening,
and that in this respect he was somewhat exacting. In this
way and in this relation the plaintiffs lived in this house from

about October 1, 1897, to February 25, 1901, the day of the death of Bird. After his death they continued to live there a few months, when they moved away, finally going to the house in Cypress Street, where they have since lived. They took with them as their own many pictures, some of considerable value, under a claim that these had been bought by Bird for them and given to them while they were living in his house. Two of these pictures they afterwards sold for $10,000, and there was evidence that the others were worth in the aggregate from $15,000 to $20,000. There was evidence that Bird paid for the pictures carried away by the plaintiffs over $30,000. He had also transferred to Susan a trust agreement made by and between him on the one hand and Baker and Briscoe on the other, by which an annual payment of $750 was to be made by the latter for twenty years ; and also the promissory note of a third party for $5,000, upon which, however, she realized only $700. Certain small balances from moneys handed by him to them for household expenses and not used by them for that purpose had been by his consent retained by them for their own personal use. The evidence tended to show that in these various ways property costing over $60,000 was given and transferred by Bird to the plaintiffs while they were in the house with him. Shortly before his death he sold a lot of land, receiving back in part payment therefor a promissory note for $40,000, secured by a mortgage of the land, and there was evidence tending to show that he intended to transfer the note and mortgage to the plaintiffs, but that he waited for the return of the mortgage from the registry and died before it was returned.

The defendant was appointed administrator on February 28, 1901, and this action was brought on February 19, 1903, about ten days before the expiration of the term fixed by the statute of limitations. The trial took place in December, 1904, with the result above stated.

The whole evidence is before us. It was entirely oral, and came chiefly from the plaintiffs themselves, who testified to conversations between themselves and Bird, at which no one else was present.

Was there any agreement express or implied between Bird and the plaintiffs that the latter should receive compensation,

and if so, what was it? Inasmuch as the finding was for the
plaintiffs, it is clear that the judge found that there was no
agreement that the services should be rendered gratuitously, or
in sole reliance upon such gifts as Bird should voluntarily make
to the plaintiffs in his lifetime, with no obligation on his part to
give anything. The services were not rendered gratuitously.
The plaintiffs were to be paid. In so finding, the judge was
justified by the evidence.

But how were they to be paid? There is much evidence
tending to show that the agreement was that Bird should make
a testamentary provision for the plaintiffs, and that they relied
on that alone for their remuneration. The evidence would jus-
tify a finding either way on that point, but inasmuch as the
judge gave the third ruling requested by the defendant, which
was in substance that if the services were rendered upon any
such agreement then, since it was not in writing, this action
could not be maintained, (R. L. c. 74, § 6,) it is manifest that
he found there was no such agreement. We cannot as matter
of law disturb his finding that way.

We have then the ordinary case of services rendered under
an agreement express or implied for compensation not testamen-
tary in its nature. The first and second counts of the declara-
tion are substantially the same and could be sustained either by
proof of an express contract to pay the sum named, or by proof
that the services were worth that sum. *Manilla* v. *Houghton*,
154 Mass. 465, and cases there cited. The third is on *quantum
meruit*, and the fourth on a special contract to pay "not less
than $200,000."

It is difficult to see how upon the evidence it could be found
that there was any express contract to pay a definite sum or
a sum " not less than $200,000," or to give or deliver to the
plaintiffs any particular thing or any fractional part of his es-
tate upon which a value can now be placed. Assuming that the
services were to be paid for and not by testamentary provisions,
the most natural explanation of the evidence would seem to be
that there was no definite agreement as to the amount of com-
pensation, and that the plaintiffs must stand upon *quantum
meruit*. But however that may be, it is certain that the evi-
dence would warrant a finding upon *quantum meruit*, and there

is nothing to show that the general finding for the plaintiffs was not based upon that ground. In that state of the evidence the defendant requested the judge to rule that " if the plaintiffs rendered the service disclosed in the evidence without any agreement with the defendant's intestate, then that they are entitled to recover only such sum as the services were actually worth." The judge refused to give this ruling. It is argued by the plaintiffs that if the first part of this request " is to be interpreted literally it includes both express and implied agreements, and . . . would call for a ruling that the plaintiffs would not be entitled to recover at all." But we think that the request, taken in connection with its setting, is to be construed as meaning that if there was no express agreement as to the amount of compensation then the basis of it must be what the services were actually worth. It is to be noted that during the trial the judge had said that the question was " What did he [Bird] lead them to believe they were to have to live on in the future if they were to come there and stay with him. I can't think of any other way that we can get at it." He had said also, at the same time, during the trial, " They didn't make a definite statement as to the amount; I am in doubt whether it could be said there was an understanding on their part. Supposing he had said he was going to give them the greater part of the property if they would come there, that would be one way to reach it perhaps; but I don't know as that would be very definite; it isn't very easy to determine." It seems reasonably clear that the defendant was apprehensive that, owing to the peculiar circumstances of the case and the vague and indefinite nature of the evidence as to the agreement for compensation, if the judge should come to that question, there was danger that the view might be taken by the judge that, in the absence of any agreement for compensation except that implied by law from the employment, he might adopt as the rule of damages not what the services were actually worth, but, instead thereof, what the plaintiffs supposed they were to receive, although there was no agreement about it. If there was no agreement for compensation excepting that arising in law out of the employment, then in this action the only basis of compensation was what the services were actually worth. It is true that upon the

question of the value of services, especially such as were rendered in this case, the judge may properly take into consideration as evidence the valuation placed upon them by the parties, especially by the party to whom they are rendered; but such valuation is only evidence; it is not the rule of damage. That remains the same, and is the actual value of the services. The ruling requested correctly stated the law applicable to one possible, indeed probable, view of the evidence. It does not appear that it was refused upon the ground that it was immaterial upon the facts found by the court. The refusal therefore to give it was error. See *Clarke* v. *Second National Bank,* 177 Mass. 257, 267.

The conclusion to which we have come upon this point renders it unnecessary to consider the other grounds of defence.

*Exceptions sustained.*

*E. B. Gibbs & G. Cunningham,* for the defendant.
*F. H. Williams,* for the plaintiffs.