JOHN HETHERINGTON AND SONS, Limited, *vs.* WILLIAM FIRTH COMPANY.

Suffolk.    March 28, 1911. — September 6, 1911.

Present: KNOWLTON, C. J., MORTON, HAMMOND, BRALEY, & RUGG, JJ.

*Practice, Civil,* Hearing by judge without jury, Conduct of trial: requests and rulings, Exceptions. *Contract,* Modification, Cancellation, Performance and breach, Construction. *Statute of Frauds. Evidence,* Presumptions and burden of proof. *Damages,* In actions of contract, Prospective profits.

From a bill of exceptions taken by a defendant to the rulings of a judge at the hearing of an action at law without a jury it appeared that at the close of the evidence the defendant presented to the judge in writing nineteen requests for rulings, several of which contained assumptions of fact, and that the judge made a general finding for the plaintiff but did not file any memorandum as to facts found by him. As to his disposition of the requests, the bill of exceptions stated that "these requests, though not expressly passed on by the court, are to be treated as refused, the defendant having duly reserved its exceptions, it being understood, however, that the facts assumed or hypothetically stated in these requests are to be taken as true only in so far as sustained by the evidence herein contained and referred to." *Held,* that the passage quoted above must be taken to mean that the requests were refused, and that, if on any view of the evidence reported the facts assumed in the requests could have been found, such facts were to be treated as so found.

Where, at the hearing of an action at law by a judge without a jury, at the close of the evidence a ruling is asked for such as should have been given if the trial had

been before a jury, an exception to a refusal to give it must be sustained unless the ground of refusal is distinctly stated or plainly appears in some way on the record and is such that no harm is done by the refusal, or unless it is obvious on the whole record that no rights of the parties have been endangered.

A judge, hearing an action at law without a jury, in refusing a request for a ruling founded upon evidence is required to state expressly or by fair inference either that the legal proposition presented is unsound or inapplicable, or that the facts upon which it is predicated are not found to be true.

A merchant in Boston previous to March of a certain year had dealt with a manufacturing corporation in England under a contract in writing by which on certain terms he sold goods of the manufacturing corporation of a certain kind and no one else's goods of that description. The merchant in March incorporated his business and the two corporations then made a contract under seal for a period of five years which was intended to be on the same terms as that which formerly had existed between the manufacturing corporation and the merchant. Two months later, it having been discovered that the terms expressed in the contract between the corporations were not as intended, the parties agreed by correspondence that the contract of March should be treated as though it expressed the terms as they were intended to be. In July the merchant was in England and asked to have the March agreement "corrected" to state the intention of the parties. The board of directors of the manufacturing corporation voted to "cancel" the March agreement and to issue in substitution therefor a new agreement to accord with what the parties intended. Thereafter the two copies of the March agreement were torn into small pieces by the secretary of the manufacturing corporation and mailed to the merchant with a letter stating, "The old agreements which I think are sufficiently cancelled are enclosed herewith." The new drafts of agreements, executed by the manufacturing corporation, were sent to the Boston office of the merchant corporation for execution by it, and were returned by its resident treasurer with a suggestion as to a further and entirely new alteration. Nothing further was done about the execution of the new contract until, in August, the merchant corporation refused further to sell the goods of the manufacturing corporation. At the hearing by a judge without a jury of an action by the manufacturing corporation against the merchant corporation for breach of the March contract the foregoing facts appeared and there was evidence tending to show that the merchant was present at the meeting of the manufacturing corporation when the vote cancelling the March contract was passed, that the secretary of the manufacturing corporation, when he tore up the March contracts and sent them to the merchant, did so to calm an apprehension of the merchant that so long as the original paper was in existence there was a possibility that he might be bound by its erroneous terms, that the merchant never had asked to have the March contract cancelled or annulled, that to the minds of the officers of the manufacturing corporation it was "still running" in August, and that during July and August the merchant corporation was dealing with the manufacturing corporation as though the March contract, as modified by the correspondence, was in force. The judge found for the plaintiff. *Held*, that the defense of the statute of frauds, based on the fact that the contract was modified by a proposition in writing by the defendant assented to only orally by the plaintiff, could not be sustained; that the evidence warranted a finding that the contract was not annulled by mutual consent, the mutilation of the contract by the plaintiff being only one factor, not in itself conclusive, to be considered on that issue; and that a finding for the plaintiff was warranted.

In an action of contract where the plaintiff makes a claim for damages to his business resulting from a breach of contract by the defendant, he may recover prospective profits as damages where loss of profits is the proximate result of the breach such as in the common course of events reasonably might have been expected, at the time the contract was made, to ensue from a breach, and where it can be determined as a practical matter with a fair degree of certainty what the profits would have been; but profits cannot be recovered when the contract, interpreted in the light of all its surroundings, does not appear to have been made in contemplation of such damages or when they are remote or so uncertain, contingent, or speculative as not to be susceptible of trustworthy proof. They must be capable of ascertainment by reference to some definite standard, either of market value, established experience or direct inference from known circumstances. In the present case it was *held* that the terms of the contract showed that loss of profits was not contemplated by the parties when the contract was made as a measure of damages that might result from a breach; and that all the circumstances, both before and after the execution of the contract, furnished a basis too insubstantial for the ascertainment of profits lost by the plaintiff.

An English manufacturer of machinery of a certain description made with a Boston merchant a contract under seal, which, reciting that it was proposed to continue an agreement theretofore existing between the manufacturer and a predecessor of the merchant and "to vest" that contract in the merchant, provided that the manufacturer gave to the merchant the sole right to sell his machinery in the United States and Canada, and the merchant undertook to sell efficiently and to appoint representatives to travel regularly in those countries for the purpose of procuring orders for the manufacturer's goods; that the merchant during the continuance of the agreement should not be engaged or interested within the territory mentioned in the sale of any other goods of that description and that the manufacturer should do all his business in that territory through the agency of the merchant, referring to it all inquiries for that territory; that all goods should be invoiced as delivered and a statement rendered to the merchant at the beginning of the following month and paid by him in sixty days, and that "by virtue of these terms of payment" the merchant should have the right to and should conduct all business in his own name; that the agreement should remain in force for five years except that, in the event that it was found that the merchant could not work the business as efficiently as his predecessor had, the manufacturer might terminate it on six months' notice. The merchant unjustifiably refused, after performance for six months, to perform further. In an action by the manufacturer for breach of the contract, it was *held* that the contract had a double aspect, since in one essential respect it created the relation of principal and agent and in another view it contemplated as between the parties purchases and sales; that, while under the circumstances of the case and because of the nature of the contract the plaintiff could not recover for loss of profits under that aspect of the contract that contemplated purchases and sales, substantial damages might be recovered for breach of the contract in its agency aspect due to the expense cast up' the plaintiff in establishing like relations with a new agency and in regaining the position which he had acquired under the contract with the defendant an' had lost by his unjustifiable act.

CONTRACT for breach of a contract in writing, dated March 7, 1900, and to continue for five years, which established terms

under which the defendant alone should sell exclusively certain machinery of the plaintiff in the United States and Canada, and which was alleged to have been modified by an offer of the plaintiff in writing accepted by the defendant orally as hereinafter described, the breach of the contract relied on being that in August, 1900, the defendant ceased to sell machinery of the plaintiff and began selling that of another manufacturer. Writ dated November 15, 1901.

The case was referred to James D. Colt, Esquire, as auditor. He filed a report in which he found for the defendant, giving as his reasons in substance that the original contract between the parties was formally cancelled and that no new contract or agreement ever was made to take its place.

In the Superior Court the case was heard by *Raymond*, J., without a jury. The auditor's report was introduced in evidence by the defendant, and much other evidence which was not before the auditor was introduced by both parties.

It appeared that previous to March 7, 1900, one William Firth of Boston had been selling textile machinery, of which the plaintiff was a manufacturer in England on a large scale, under a contract with the plaintiff; that, Firth having formed the defendant corporation to which he had transferred his business and of which he owned almost all of the capital stock, the plaintiff and the defendant made the following contract under seal as of the date of March 7, 1900:

" Whereas it is proposed to continue the Agreement hitherto existing between John Hetherington and Sons Ltd and William Firth Esq of Boston aforesaid and to vest the same in a new company entitled the William Firth Company.

" It is hereby mutually agreed that the said John Hetherington & Sons Ltd give the said William Firth Company the sole right to sell their machinery in the United States of America and the Dominion of Canada and the William Firth Company undertakes to sell efficiently and to appoint representatives to travel regularly in those countries visiting the existing mills and districts in which mills may be erected for the purpose of procuring orders for all the various machines made by the said John Hetherington and Sons Ltd.

" That the William Firth Company shall not during the con-

tinuance of this agreement be engaged or interested in the sale in the United States of America or the Dominion of Canada of any other spinning machinery similar to or made and used for the same purpose as the spinning machinery made by John Hetherington & Sons Ltd. That John Hetherington & Sons Ltd shall do all business with the United States of America and the Dominion of Canada through the agency of the William Firth Company referring to them all enquiries they know are for those countries.

" That all machinery shall be invoiced as delivered and a statement of such deliveries made during the month shall be rendered by the first available mail in the following month and paid by the said William Firth Company at the end of that month by virtue of these terms of payment the William Firth Company shall have the right to and shall conduct all business in their own name.

" That this agreement shall remain in force for a period of five years from the date thereof and shall at the expiration of that time be determined or continued by six months previous notice given by either of the parties thereto Provided always that in the event of it being found that the William Firth Company cannot work the business as efficiently as it has been worked by William Firth John Hetherington & Sons Ltd shall have the right to terminate this agreement by six months notice to be given at any time."

Early in the following May it came to the attention of the defendant that the terms of payment in the above contract were not the same as those of the contract between the plaintiff and Firth, in which it had been agreed that all accounts made up on the thirty-first of each month should be paid in sixty days or Firth should pay interest at five per cent. After some correspondence between the parties in May, the defendant stipulated in all inquiries as to prices during the rest of that month that payment should be sixty days from the date of shipment, and all offers accepted by the plaintiff during that month were accepted on that basis. On June 2 the defendant wrote the plaintiff saying: " What we meant by payable on shipment two months was payable two months from invoice date. To save expense in future quotations we ask you for, please understand that all our inquires are on this same basis, that payment shall be made two months from date of invoice unless special terms are made, and trust

this will meet with your approval." This was acquiesced in and acted on by the plaintiff and all accounts were rendered and settled on that basis up to August 22.

In the latter part of May Firth went to England and while there urged that the contract of March 7 be corrected. On June 25, being still in England, he wrote to the secretary of the plaintiff, " Will you have the agreement changed from 30 days to 60 days and signed? Send direct to Boston. I think changing date and initialing the same will be all that is required."

There was a meeting of the plaintiff's board of directors on July 2. There was conflicting evidence as to whether Firth was present. The records of the meeting stated that he was present, and contained the following vote: " Agreement with William Firth Co., the clause relating to payment in the agreement dated the 7th of March 1900 between this company and the William Firth Company was found not to be in accordance with our former practice with William Firth, and it was moved by Messrs. J. Hetherington seconded by E. P. Hetherington, and Resolved that the agreement between this company and the William Firth Company signed and sealed on the 7th of March 1900, be and is hereby cancelled and in substitution thereof a new agreement, the terms of which have been read to the meeting, be signed by any two directors and the secretary of the company and sealed with the Company's seal." There was evidence tending to show that some one at the meeting had suggested that it would be sufficient to make the change in the existing agreements and to initial the change, but that the chairman said he already had told the secretary to draw fresh copies; that these copies were dated March 7, 1900, and were exactly like the copies of the agreement already in existence except that in place of the words "at the end of the month after the month of delivery in Liverpool" were put "at the end of the second month after the month of delivery in Liverpool"; that these copies were read to the meeting in the presence of Firth and Firth was asked by the chairman if the agreement as altered and read over was satisfactory to him and that he said it was, and that then the resolution as contained in the records was passed and the amended copies were executed by two directors of the plaintiff and the seal of the plaintiff was affixed; that Firth then was asked to sign them, and he said " You had better

send them on to Boston and our people will execute it in the proper manner." The secretary of the plaintiff then asked the chairman whether he had not better mark the two old copies with the word " Cancelled " or something of that kind and the chairman said " Oh, no. Mr. Firth has approved of the new ones. Tear them up," and that he tore both copies in two, Firth being present during the whole proceeding. The plaintiff's secretary further testified that after the meeting adjourned he took the torn pieces of the original copies and tore them into small fragments and enclosed them to Firth at Blackpool in a letter as follows: " Dear Sir: The old agreements which I think are sufficiently cancelled are enclosed herewith "; and that his reason for tearing up these fragments and writing the letter returning them to Firth was to calm apprehensions that Firth had expressed that so long as the original paper was in existence there was a possibility that he might be called upon to pay in accordance with its terms.

The day following the meeting of the plaintiff's board of directors the re-drafted contracts were sent to the defendant's Boston office, and in the course of the mails the defendant's treasurer returned them with a suggested further alteration to the effect that the defendant should have the option of giving notice and terminating the contract in case the quality of machinery furnished by the plaintiff and the times of their deliveries were such as to injure the defendant. Action on the subject by the plaintiff's board of directors was delayed pending the absence of the chairman and the defendant was notified to that effect. No further action was taken by the plaintiff and no further communications were sent to the defendant with regard to the contract. The re-drafted contracts never were executed by the defendant.

There was evidence that Firth never had asked to have the contract cancelled or annulled, that to the minds of the plaintiff's officers the contract was " still running " in August, 1900, that between July 2 and August 22 the defendant was carrying on business in America as before as representative of the plaintiff, taking fresh orders for the plaintiff's machinery, giving fresh orders to the plaintiff and corresponding with the plaintiff with regard to future business, without any reference to any amendment, cancellation, or change in the relations existing under

the contract of March 7 other than the change in the time of payment.

There was evidence that in June and July, 1900, the plaintiff was short of working capital owing to the fact that it had made large sales on long credit; that during the previous four years it had lost some £125,000, that it had an arrangement with its bankers by which it was allowed a drawing credit of between £80,000 and £90,000, for which security was given, and that drafts against this credit during the spring and summer of 1900 were currently between £70,000 and £76,000; but there was evidence that it was not insolvent; that most of the losses above referred to had occurred during the early part of the four year period and had resulted in part from a strike; that Firth after his arrival in England had informed himself as to the condition of the plaintiff and had conferred with its officers in regard to its financial needs, and that on July 16 at a meeting at which Firth was present a long discussion took place as to the best course to be taken by the company in its then condition, the questions of voluntary liquidation, raising of new capital and amalgamation with another firm or firms in the same business were discussed and ultimately the plaintiff's auditor was requested to approach some firm or firms in the machinery trade and sound them as to whether they would be willing to take over the business at a price to be arranged; that the suggestion of liquidation was made by Firth and was not approved by any others present, and that the auditor of the company said there was absolutely no necessity for anything of the kind; that at this meeting Firth himself suggested approaching Howard and Bullough, competitors, that the plaintiff's officers never intended selling out the plaintiff's plant or business; that representatives of two of three other firms were sounded as to possible amalgamation or taking over of the plaintiff's business, but that these inquiries had been ended by August 22 and had come to nothing; that from July on there were various plans under discussion for reorganization or getting new capital but that no new capital was in fact procured; that the company continued its business successfully and increased it; that the production of the company and its deliveries of its products during the summer of 1900 were in excess of all previous times and that its production

and shipment during the year 1900 were the greatest in its history up to that time; that the company did not in fact amalgamate with or sell out its business to any other company but successfully continued its business without interruption; that at no time was it pressed by any of its creditors or threatened with any proceedings by them.

Other facts are stated in the opinion.

The defendant made nineteen requests for rulings, the substance of all of which, except those numbered sixteen, seventeen, eighteen and nineteen, sufficiently appears from the opinion. The requests so numbered were as follows:

" 16. Since no prices are fixed by the contract of March 7, 1900, at which machinery was to be sold by the plaintiff to the defendant corporation, but those prices were left to be fixed from sale to sale by agreement of the parties, no damages can be assessed based upon the profit which the plaintiff would have made upon any given amount of sales.

" 17. The contract having provided no standard of prices at which sales were to be made by the plaintiff to the defendant during the five years from March 7, 1900, and those prices having been left entirely to the agreement of the parties from time to time, the plaintiff cannot recover even for such sum as the ccurt may think the plaintiff and the defendant would have agreed upon, and any such standard is too vague and indefinite for legal ascertainment.

" 18. If the court finds that the sale of English machinery was seriously interfered with during the five years from March 7, 1900, as the result of American competition, and that prices of the various machines fell heavily during that period, then the court cannot determine how much the defendant would probably have agreed to pay the plaintiff on such sales as it thinks the defendant would have been able to make.

" 19. The fact that the contract established no scale of prices; that the prices were very much reduced for the five years from March 7, 1900, below those of the previous five years; that the defendant corporation, and not William Firth, was making the sales; that several kinds of machinery were entirely driven out of the market by American competition and prices, rendered the plaintiff's damages, if any, too problematical for ascertainment."

The action of the presiding judge as to the requests for rulings is described in the opinion. There was a finding for the plaintiff for $59,500; and the defendant alleged exceptions.

*S. J. Elder,* (*F. E. Bradbury* with him,) for the defendant.

*J. B. Warner,* (*H. James, Jr.,* with him,) for the plaintiff.

RUGG, J. 1. A question of practice as to trials at law before a judge sitting without a jury lies at the threshold. The defendant seasonably presented requests for rulings. It is said in the exceptions that "these requests though not expressly passed on by the court are to be treated as refused, the defendant having duly reserved its exceptions, it being understood, however, that the facts assumed or hypothetically stated in these requests are to be taken as true only in so far as sustained by the evidence herein contained and referred to." We interpret this as meaning that the requests were refused. If the court ignored them the defendant's rights can be no higher than if the court refused them. It means further that if on any view of the evidence reported, the facts assumed in the requests can be found, then the facts are to be treated as so found. We are led to this construction of the exceptions because it is the only one which is fair to the excepting party. Otherwise it could not be determined what the view of the Superior Court was as to the matters covered by the prayers. The Superior Court judge filed no memorandum and made only a general finding for the plaintiff. One branch of the plaintiff's argument has been that the exceptions must be overruled on the ground that it must be assumed that the judge did not find the facts recited in the prayers and that so far as bald requests for correct rulings of law have been refused it must be assumed that facts have been found by the judge which made inapplicable such principles. While a case may be imagined where such an argument may prevail, it cannot ordinarily, nor in this case. When controverted issues of fact are tried without a jury, before a judge who makes only a general finding, it would be manifestly unjust if the defeated party could not be assured in some way that correct rules of law have been followed. Where the facts are not agreed and no memorandum of findings is filed, commonly it cannot be certain precisely what facts are found or which witnesses are believed by the trial judge in reaching his conclusions. If it

were necessary for an excepting party not only to maintain the soundness of the law as stated in his requests but also to show that the facts supposed as the groundwork of his request must have been found on the evidence, and that no other facts could have been found which would make inapplicable the ruling of law asked for, parties in jury waived cases could not know, save in comparatively rare instances, that a grievous error of law had not been committed by the trial judge.  When a case is tried without a jury, the judge occupies a dual position; he is the magistrate required to lay down correctly the guiding principle of law; he is also the tribunal compelled to determine what the facts are.  When these duties are nicely analyzed, he ought as judge to formulate the governing rules of law, and then, acting in place of the jury, he ought to follow these rules in deciding where the truth lies on conflicting evidence.  In one essential particular only does he stand differently as to requests for rulings from a judge presiding over a jury trial, — he may refuse to grant a request for the avowed reason that it is immaterial or inapplicable in view of the facts found by him.  When a request is presented such as in a jury trial ought to have been given, an exception to a refusal to grant it by a judge sitting without a jury must be sustained, unless the ground of refusal is distinctly stated or plainly appears in some way on the record and is such as to show that no harm has been done by the refusal, or unless it is obvious on the whole that no rights of parties have been endangered.  Mere silent refusal to grant requests under these circumstances does not raise the presumption in favor of a trial court, which exists as to findings of fact made by it.  This is no new principle of practice.  The present judgment is simply an amplification of a rule inherent in the trial of jury waived cases, which has been more succinctly announced in earlier cases.  *Miller* v. *Robinson*, 2 Allen, 610.  *Kettell* v. *Foote*, 3 Allen, 212.  *Lane* v. *Boston Five Cents Savings Bank*, 118 Mass. 260.  *Turner* v. *Wentworth*, 119 Mass. 459, 464.  It was stated by Chief Justice Holmes, in *Clarke* v. *Second National Bank*, 177 Mass. 257, 266, by Mr. Justice Loring in *Jaquith* v. *Davenport*, 191 Mass. 415, at 418, and by Mr. Justice Hammond in *Chandler* v. *Baker*, 191 Mass. 579, 585.  To the same point see also *Maynard* v. *Royal Worcester Corset Co.* 200 Mass. 1, 5;

*Bangs* v. *Farr*, 209 Mass. 339.  There is nothing inconsistent with this view in *Carnes* v. *Howard*, 180 Mass. 569.  The statute upon which the court acted in *Insurance Co.* v. *Folsom*, 18 Wall. 237, required a procedure unlike our own.  This rule does not impair the efficiency of the Superior Court, nor restrict its power to administer justice promptly and completely.  It is not a recurrence to technicality of practice.  It does not invite or justify an unreasonable number of prayers calculated rather to entrap the unwary than to elucidate the principles involved. It does not require that exceptions be sustained when it is not apparent upon the whole that some substantial error injuriously affecting the rights of parties has been committed.  It does not compel the judge to deal in detail with fragmentary or indecisive evidence, to be troubled by trivial requests, or to make a special finding, although, as was pointed out in 177 Mass. at p. 264, often it may prove helpful if the grounds of his action are explained.  But it does require him, when refusing a request, founded upon evidence, to state expressly or by fair inference, either that the legal proposition presented is unsound or inapplicable, or that the facts upon which it is predicated are not found to be true.  Failure in this regard affords reasonable apprehension that there has been a miscarriage of justice.

2.  The defendant's requests to the effect that the plaintiff could not recover upon the contract of March 7, 1900, were refused rightly.  It does not appear to have been conceded that this contract when executed was not binding upon the parties. There was ample evidence that both parties supposed that the contract continued in force until August, and treated it as if in force.  The only dispute about it was that the defendant asserted that there was a mistake in it as to the term of credit to be extended to it.  It might have been found that the contention of the defendant in this regard, which was expressed by it in writing to the plaintiff, was accepted orally by the latter, and as thus corrected became binding upon the defendant, and available to the plaintiff, although not signed by both parties.  The statute of frauds would be no defense under these circumstances.  *Beach & Clarridge Co.* v. *American Steam Gauge & Valve Manuf. Co.* 202 Mass. 177, and cases cited at p. 181.

3.  It was open for the trial judge to find that the contract

was not annulled by mutual consent.  The vote of cancellation by the board of directors of the plaintiff was not decisive, and may have been found in the light of all the testimony and the attendant circumstances to have been conditional upon the execution of a new one in substitution, a condition which was never fulfilled.

4.  The mutilation of a copy of the contract by the plaintiff was only one factor, not necessarily conclusive by itself, and to be considered with all the others in ascertaining the intent with which the act was done.  *Attorney General* v. *American Legion of Honor*, 206 Mass. 183.  The general finding for the plaintiff involved the conclusions as matter of fact that the contract of March 7, 1900, as modified was binding upon the parties and had not been annulled or cancelled.  In this no error appears.

5.  There were no circumstances, which required a finding of such inability on the part of the plaintiff to carry on its business or intention on its part to sell out as to justify the defendant in abandoning its contract.  The action of the plaintiff at most amounted to a determination to ascertain at what price its business could be sold for.  It did not fairly warrant the inference of inability to go on with the contract.  *National Contracting Co.* v. *Vulcanite Portland Cement Co.* 192 Mass. 247, and cases cited at p. 256.

6.  The plaintiff is a manufacturer of textile machinery in England.  William Firth, for some years previous to 1900, had the exclusive sale of the plaintiff's machinery in America, and early in 1900 organized in the United States a corporation, of which he was the principal stockholder, president and manager, to take over his business.  Under date of March 7, 1900, a written contract was made between the plaintiff and the defendant, by which the plaintiff gave the defendant " the sole right to sell their machinery in the United States of America and the Dominion of Canada," and the defendant undertook " to sell efficiently and to appoint representatives to travel regularly in those countries visiting the existing mills and the districts in which mills may be erected for the purpose of procuring orders for all the various machines made by " the plaintiff.  The defendant further agreed not to engage in the sale of other similar machinery in

the designated territory during the term of the contract, and the plaintiff agreed to do all its business in the same territory through the agency of the defendant. All the machinery was to be invoiced to the defendant as delivered, and was to be paid for by the defendant within a specified time, the defendant to conduct the business in its own name. The contract was to continue in force for five years, unless terminated sooner by the plaintiff on six months' notice "in the event of it being found that the William Firth Company cannot work the business as efficiently as it has been worked by William Firth." The contract was terminated by the defendant without justification in August or September, 1900. The case was tried before a judge of the Superior Court without a jury, and a finding was made in favor of the plaintiff apparently based on the ruling that the plaintiff was entitled to recover the loss of profits on sales of machinery occasioned by the act of the defendant. We draw this inference from the refusal of the court to grant requests sixteen, seventeen, eighteen and nineteen of the defendant which cover this ground. The correctness of this ruling is challenged.

The fundamental principle of law upon which damages for breach of contract are assessed is that the injured party shall be placed in the same position he would have been in, if the contract had been performed, so far as loss can be ascertained to have followed as a natural consequence and to have been within the contemplation of the parties as reasonable men as a probable result of the breach, and so far as compensation therefor in money can be computed by rational methods upon a firm basis of facts. *Leavitt* v. *Fiberloid Co.* 196 Mass. 440, 446. *Wertheim* v. *Chicoutimi Pulp Co.* [1911] A. C. 301, 307. When a claim for prospective profits is brought to the test of this principle, recovery can be had where loss of profits is the proximate result of the breach, and is such as in the common course of events reasonably might have been expected, at the time the contract was made, to ensue from a breach, and where it can be determined as a practical matter with a fair degree of certainty what the profits would have been. But profits cannot be recovered, when the contract interpreted in the light of all its surroundings does not appear to have been made in contemplation of such damages, or when they are remote, or so uncertain, contingent, or speculative as not to

be susceptible of trustworthy proof. They must be capable of ascertainment by reference to some definite standard, either of market value, established experience or direct inference from known circumstances. *Gagnon* v. *Sperry & Hutchinson Co.* 206 Mass. 547, and cases cited at p. 555. *Dennis* v. *Maxfield*, 10 Allen, 138. This is simply a concrete application of the wider principle, which is frequently adverted to and which pervades the determination of all legal rights, to the effect that the complaining party must establish his claim upon a solid foundation in fact, and cannot recover when any essential element is left to conjecture, surmise or hypothesis. The difficulty is not so much in the statement of the general principle as in applying it. A comparatively insignificant incident may be in such combination with others as to lead to a conclusion in one decision apparently at variance with that reached in others. Each case must be decided on its own facts under this necessarily somewhat broad and comprehensive proposition.

This contract had a double aspect. In one respect it created the relation of principal and agent, and in another view it contemplated as between the parties purchases and sales. Looking at the latter first, it appears that while the plaintiff was to sell its machinery in the United States and Canada only through the defendant, the defendant was the buyer and was to make its profits by gains in resales, and was not to be paid by commissions. There was no agreement for any specific amount of sales. No maximum or minimum of aggregate annual transactions was stipulated. There was no obligation on the plaintiff to manufacture or on the defendant to take any definite number of designated machines. No prices were fixed. Whether there should be any sales depended upon a meeting of minds between the parties as to each article. Each sale would depend in the ordinary course of business upon the cost to the plaintiff of manufacturing, the profit demanded by it, the price which could be obtained in the American market, and the margin which the defendant might need to meet its expenses and a fair return upon capital invested and reasonable profit. No measure of remunerative profit for the plaintiff was settled, either by the contract or by the custom of the trade. It appeared that sometimes it had sold machinery to the defendant at a loss. There

was evidence that the selling price of the plaintiff and its actual cost of manufacture bore no settled ratio to each other. The expenses of the defendant and its fair profit contained inherently uncertain elements resting in large part upon the volumes of business done. The contract was silent as to any gauge of this, either by analogy to commissions, percentages, or otherwise. All these considerations, difficult if not impossible of proof, would enter into the minds of the parties in making each sale. The reported evidence shows plainly that there was great fluctuation in the demand by American cotton manufacturers for English-made machinery. This depended in material degree upon the mechanical ingenuity and business sagacity of competing American machine makers, and upon the prosperity of American cotton manufacturers. The conditions of both these branches of industry were subject to periods of depression and activity, as to which during the time covered by this contract there was much conflicting testimony. The variation in the annual sales by the plaintiff to the predecessor of the defendant in handling its American trade during the five years before 1900 had been from £15,000 to £140,000. The number of sales which the defendant would have been able to make to its customers was problematical. It could have made none, unless the prices fixed by the plaintiff upon its machines from time to time had been such as to enable it to attract American buyers. The defendant, although taking over at its incorporation the business conducted formerly by William Firth, had as a corporation no record of commercial achievement. Although Mr. Firth was the chief stockholder in the defendant, he was under no obligation to continue in its service, and might have sold his interest in it or left its employ at any time. The contract gave to the plaintiff no assurance that his ability would be retained in the business. It is conceivable that the contract might have been faithfully performed on both sides, and yet no important sales have been made. This might have arisen from a variety of circumstances liable to occur in ordinary trade. The plaintiff rests its claim for loss of prospective profits on two classes of evidence, — first, upon that showing the difference between its total sales in America for the five years next previous to the execution of the contract and its sales in America during the term of the contract,

and computing upon this difference the profit which it claims it would have made; and, second, upon testimony to the effect that immediately after the defendant's breach of contract its sales in America fell off greatly, as compared with those of the preceding seven months, until its new American agency was established.    As to breaches of some contracts different in character from the one at bar and more explicit in their obligations, evidence of this nature might be important or even conclusive.    *Loughery* v. *Huxford*, 206 Mass. 324.    But the vagueness of this contract and the absence from it of elements vital to any binding or enforceable contract of sale have been pointed out.    It must be construed as made and not reconstructed to meet an apparently unforeseen emergency.    Perhaps no one of these factors by itself would be decisive.    But taking them as a whole, we are of opinion that the terms of this contract show that loss of profits was not contemplated as damages for a breach, and these, together with all the circumstances, both before and since its execution and breach, furnish a basis too insubstantial for the ascertainment of profits lost by the plaintiff. Moreover the interpretation we have adopted seems consonant with what may have been the intention of the parties.    A new mechanical device may render obsolete machinery previously in wide use.    A change in the tariff policy of governments may seriously affect the course of international commerce.    These and other contingencies may have induced a contract of such elastic and indefinite terms as to leave each party somewhat free to act in view of altered conditions as they might arise, without being bound to hard and unyielding provisions.    *Noble* v. *Hand*, 163 Mass. 289.    *Todd* v. *Keene*, 167 Mass. 157.    *United Press* v. *New York Press Co.* 164 N. Y. 406.    *Howard* v. *Stillwell & Bierce Manuf. Co.* 139 U. S. 199.    *Eckington & Soldiers' Home Railway* v. *McDevitt*, 191 U. S. 103.    *Cincinnati Siemens-Lungren Gas Illuminating Co.* v. *Western Siemens-Lungren Co.* 152 U. S. 200. *Troy Laundry Machinery Co.* v. *Dolph*, 138 U. S. 617.    *Sapwell* v. *Bass*, [1910] 2 K. B. 486.    *Ex parte Maclure*, L. R. 5 Ch. 737. *McCornick* v. *United States Mining Co.* 185 Fed. Rep. 748. *Connersville Wagon Co.* v. *McFarlan Carriage Co.* 166 Ind. 123.

The case at bar is distinguishable from *Speirs* v. *Union Drop Forge Co.* 180 Mass. 87.    In that case the contract was to keep

an entire factory employed.   Many of the prices for the staple articles to be manufactured were determined.   In the value of the manufacturing plant and the prices fixed were facts sufficient in the opinion of a majority of the court to support that action. But these elements are wanting in the plaintiff's proof.

There is ground for the assessment of substantial damages, however, in the agency aspect of the contract.   According to its terms the plaintiff was to have the active and intelligent service of the defendant, with a sufficient corps of salesmen, in pushing the sale of its products in the United States and Canada.   That contract was broken by the defendant, whereby the plaintiff was deprived of that which it was entitled to receive.   Thereupon it took the course, which it had a right to take in such an event, of establishing another agency in the United States and conducting its business through this substituted channel.   Its reasonable expense incurred in repairing the loss cast upon it by the wrongful act of the defendant and in regaining the position acquired by it under its contract with the defendant is a legitimate element of damage and may be recovered.   It is the direct result of the defendant's breach of the contract, and no doubt is capable of approximately accurate proof.   It was or should have been in the contemplation of the parties as a consequence of the breach.   *C. W. Hunt Co.* v. *Boston Elevated Railway*, 199 Mass. 220.   *Hanson & Parker* v. *Wittenberg*, 205 Mass. 319.   *Erie County Natural Gas & Fuel Co.* v. *Carroll*, [1911] A. C. 105, 117.   The other exceptions become immaterial in view of the grounds upon which this decision rests.

It follows that these exceptions must be sustained, but only in respect to the assessment of damages.   Hence the new trial must be confined to that issue.

*So ordered.*