Butler, J.
INTRODUCTION
This is a dispute between a masonry subcontractor and a general contractor. The masonry subcontractor brought suit in Middlesex County on April 14, 1988, under G.L.c. 149, §29 to collect monies allegedly due under a written subcontract and various change orders on a public works project. In addition to the claim under G.L.c. 149, §29, plaintiff seeks damages and other relief pursuant to G.L.c. 93A.
In its answer, the contractor denies that any money is owed under the contract or in quantum meruit, and in turn, seeks relief on its counterclaim for conversion (Count I), breach of contract (Counts II and IV), misrepresentations (Count III), negligence (Count V), and violation of G.L.c. 93A (Count VI).
Also, in 1988, the contractor filed suit in Norfolk Superior Court, seeking to recover building materials the subcontractor allegedly removed from the site, and seeking damages for conversion and breach of contract. That case was consolidated with the Middlesex action.
The third-party defendant, who provided the payment bond, is present as a necessary party.
The case was tried without a jury on July 21, 22, 26, 27 and 29, 1993. By stipulation at trial the parties agreed that the triable issues were:
(1) If there were a breach of the subcontract by either of the parties; and if so, which party breached and the damages, if any;
(2) If the plaintiffs action for quantum meruit has a basis in fact and in law;
(3) If either party’s claim for violation of G.L.c. 93A is warranted in fact and in law;
(4) The extent of Commercial Union’s liability as the Surety on the bond issued pursuant to G.L.c. 149, §29.
FINDINGS OF FACT THE SUBCONTRACT
In 1985, the City of Newton (City) decided to expand and upgrade its Department of Public Works maintenance garage on Crafts Street in Newton. It hired an architect, Allan Lieb, to design the project. He drafted the specifications and drawings necessary to build additions and make alterations on this site.
The defendant, Robert Cook & Sons, Inc. (Cook) is a construction company located in Braintree. Cook entered into a contract with the City to be the general contractor on the Crafts Street project. Cook secured a payment bond with Commercial Union Insurance Company (CU). Completion of the work was to be in May 1987.
The contract was to rebuild an existing building containing garages, work shops, offices and a fueling facility used by the City’s Department of Public Works (DPW). That portion of the job involved some demolition and extensive reconstruction. In addition, a new structure (“the wash bay”) was to be built for washing the DPWs vehicles.
On October 27, 1986, the plaintiff, Pasquale Minichillo d/b/a P. Minichillo & Sons (Minichillo)[1] entered into a written subcontract with Cook to furnish labor and materials for the masonry work on the Crafts Street job.[2] The prime contract was incorporated specifically by reference into the subcontract, and thus, Minichillo was bound by the applicable performance terms in the general contract. The subcontract to Minichillo for masonry work was in the amount of $440,000.
The pertinent portions of the subcontract are as follows:
1. The Subcontractor agrees to furnish all labor and materials required for the completion of all work specified in Section 04050 and Rider A of the specifications for Masonry and the plans referred to therein and Addenda No. 1,2,3, 4, 5, and 6 for the Public Maint. Garage Crafts Street Newton Ma. all as prepared by A. Lieb Architect for the sum of Four HundredForty Thousand Dollars ($440.000.00) and the Contractor agrees to pay the Subcontractor said sum for said work. This price includes the following alternates (and other items set forth in the sub-bid); Alternates (No(s) 1, 2, 3.
(a) The Subcontractor agrees to be bound to the Contractor by the terms of the hereinbefore described plans, specifications (including all general conditions stated therein) and addenda No. 1, 2, 3, 4, 5, and 6 and to assume to the Contractor all the obligations and responsibilities that the Contractor by those documents assumes to the City of Newton . . . except to the extent that provisions contained *182 therein are by their terms or by law applicable only to the Contractor.
(b) The Contractor agrees to be bound to the Subcontractor by the terms of the hereinbefore described documents and to assume to the Subcontractor all the obligations and responsibilities that the Awarding Authority by the terms of the herein-before described documents assumes to the Contractor, except to the extent that provisions contained therein are by their terms or by law applicable only to the Awarding Authority.[3]
Rider A, typed on Cook letterhead and initialled by Pasquale Minichillo on behalf of Minichillo, was attached to the Subcontract. It provided:
Scope of work including but not limited to Masonry 04050
1. Plan and specification dated 15, June 1986
2. All Staging
3. All winter protection except heating units & fuel
4. Include Alternate #1
5. Exclude chemical cleaning of existing masonry.
It was apparent from the contract documents that this was going to be a job undertaken while the buildings and site would be in active use.[4] Because the DPW would be in full operation around the construction site, Cook and Minichillo understood it to be a difficult job. It was also a phased job, in that work was scheduled to be completed on one section before work began on another. However, when the Ciiy would allow it, Cook tried to have more than one section available at a time for subcontractors’ work.
For the masonry portion, the architect designed the project with varied block, specifying many different materials and shapes. This was done largely for aesthetic reasons. Some of the blocks were standard; however, the majority of the bricks and blocks were specially ordered.
In preparing the masonry specifications, the architect estimated the number of masons required for the job, based on the square footage of masonry, the phasing of the project, the difficulty of the project, and the completion date. In his opinion, this job required a minimum of 12 masons and 3 to 4 laborers.
Pursuant to the contract, Minichillo agreed to perform the following masonry services: construction of the new wash bay building, and renovation and reconstruction of the existing DPW building. Specifically, Minichillo was to do all of the new masonry work for the wash bay building, which measured approximately 30 feet long by 25 feet wide by 22 feet in height. It was also to provide some concrete block backup, some brick veneer and a substantial amount of interior partitions in the existing building, which was about 150 feet long. Minichillo was bound and obligated to perform the masonry work in accordance with all of the applicable terms and conditions delineated in the general contract, including specifications and drawings.
METHOD OF PAYMENT
At least in part because this was a public project, requisitions and payments were controlled strictly. Minichillo was not entitled to payment for any work done outside the contract and not authorized specifically by an approved change order. Upon receipt of a request for payment from the subcontractor, Cook would review it and, if correct, would put figures on the requisition form, a typed form in six parts. The requisition forms submitted for masonry work specified three categories of masonry: Alterations (Scheduled Value: $40,000); Exterior Veneer System (Scheduled value: $190,000); and Interior Walls (Scheduled Value: $210,000). Subcontractors’ request forms were not forwarded to the city; thus, Minichillo’s bill did not accompany Cook’s application to the City for payment.
For payments to be authorized in excess of the contract price, the potential change in construction first was to be brought to the attention of the architect, Lieb, who would discuss the validity of the proposed change. If valid, Cook’s project manager, Bertram Peluso, directed the appropriate subcontractor to identify personnel and material required to effectuate the change. For extra masonry work, Peluso and the masonry manager would confer, and if they agreed, a proposed change order would be presented to the architect. A work order only became a change order if it was extra work authorized by the architect. If the architect then approved, the change request went to the mayor who also had to approve it and was required to attest that the money was approved and available.
Thereafter, the architect would issue a field order to proceed with the work, the subcontractor would submit a work order, and the project manager would attest to the fact that the work was done. This attestation, however, did not certify that the architect agreed that the work was in conformance with specifications.
EXTRA WORK AUTHORIZED BY CHANGE ORDERS
Cook and the City authorized Minichillo to perform additional work pursuant to certain change orders in the total amount of $37,014.94 ($16,200 and $20,814.94): change order #9, #12 and #14, in the amounts of $16,200, $2,685, and $18,129.94, respectively. Cook received payment in full from the City for these change orders, most of which also included charges for work performed by other subcontractors.
COURSE OF THE WORK
In December 1986, and January 1987, Cook constructed the foundations for the construction of the wash bay. The steel subcontractor constructed *183 frames. Also in December 1986, demolition on parts of the existing building was underway.
In January of 1987, the structure of the wash bay went forward. Minichillo did lay out work, and in February 1987, began masonry work. Pursuant to an addendum to the masonry subcontract, Minichillo erected a tent made of staging, wood joist and covering to enable the general contractor to heat the site. This weather envelope for the wash bay was so poorly constructed that heat was escaping. A stop work order was issued, then revoked after a sample of masonry was taken, which indicated that the lack of heat did not affect the masonry work.
Minichillo completed the block work at the wash bay and proceeded over to the three shops that are in the existing building: body shop, welding shop and paint shop.
There was no credible evidence in support of Minichillo’s claim that inadequate and/or tardy preparation work by the general contractor was the cause of its own failure to perform in a timely fashion and in accordance with specifications.
From the beginning, the clerk of the works voiced complaints about the quality of portions of Minichillo’s work. Throughout the duration and scope of the project, the work was not in full conformance with specifications.
At the outset, Minichillo brought Ideal block on the job site, notwithstanding the requirement that all block was to come from Foster masonry. Ideal block was less desirable and not in accordance with specifications. The Ideal block was ordered to be removed and replaced with Foster block.
Some of Minichillo’s work had to be removed and replaced: a wall in the blacksmith shop in the existing building varied from specified measurements by more than one inch. Other masonry work in the blacksmith shop had major deficiencies: mortar joints which were to be [3]/8 inch, maximum, instead ranged from V4 to 3/4 inch. There was a lack of uniformity in the joints and the walls, some of which were out of plumb.
In the wash bay, at the architect’s insistence, Minichillo removed and rebuilt a portion of a wall it had constructed. There remains a wall that is not in conformance with specifications. However, because there was nothing structurally wrong with the wall, the City did not require it to be removed, and instead took a credit.
Pasquale Minichillo himself did not conform his work to the plans and specifications. Pasquale Minichillo failed to use customary methods of masonry: he did not cut with a power saw or wet saw, and refused to use a mason’s level or plumb line. The walls he built were not straight and plumb as required by the specifications. Similarly, the joints did not conform to specifications.[5] The City and the architect mandated that Pasquale Minichillo be discharged. Pasquale Minichillo agreed, without protest, to leave the job some time in April 1987. Despite his departure, the work did not improve under the aegis of another masonry supervisor from Minichillo.
Glass block installed by Minichillo in the center core had to be removed because of poor workmanship. The masonry subcontractor was responsible for delays: delays in doing sample panels, improper sample panels once they were done, improper materials samples, wrong type of lime and mortar, poor workmanship within the project.
Staffing, which had been poor throughout the project, did not increase. Minichillo usually had 4 masons on site. The acceptable range was 8 to 13 masons, including masons’ laborers and tenders. Minichillo’s average of about 3 to 5 masons, at most, was inadequate.[6]
In early 1988, Minichillo needed cash and was calling Cook every day for payments. Although Cook claimed that it allowed Minichillo to “get ahead” in payments, by paying Minichillo in advance of the completion of the work (a process known as “over-requisitioning”), the requisition forms Cook submitted to the City through the architect warranted that certain work had been performed. Those forms are more credible evidence of the true status of Minichillo’s work than the testimony that the work was not as far advanced as represented to the City.
There were no masonry workers on the site in January 1988. In February, Minichillo had 4 to 5 laborers and two masons on the site. Remaining work consisted of: about a week and a half of interior partitions (preparation work was ready); the four-bay overhead door area; and the east end of the building, where preparation work had not been done.
Finally, Minichillo was discharged on or about March 14, 1988, because the masonry work was not up to specifications, and Minichillo was not staffing the job properly. Under the contract, the City and the architect had the right to seek discharge of subcontractors.
At that time of discharge, the masonry work was almost completed. As of the end of February 1988, the following percentages of work had been certified as done: 97% of alterations, 95% of interior walls, 90% of exterior veneer system.
Due to its termination of Minichillo, Cook had to build the vestibule in the center core, perform the masonry work on the four-bay overhead doors, and finish the brick veneer on the east building, as well on as the front of the east building.
There was brick and block, ordered through Minichillo, on the site at the time. The brick and block were all special orders, which required considerable time to process and were not generally usable on other jobs. The City had paid for the brick and block in *184 previous requisitions. The City therefore owned the block.
When Minichillo was discharged from the site, Peluso viewed the blocks left on site. There were a number of pallets of blocks next to the salt shed. The following Monday, the blocks needed to construct the center core of the building were missing. Peluso later found the blocks at a brickyard in Waltham. Although the documents permitted a subcontractor to requisition and store 80 percent of materials in a bonded warehouse or bonded yard, the removal of needed and purchased materials from the construction site was, at the very least, a violation of the contract. Minichillo wrongfully removed the block from the site.
Minichillo’s failures to conform to the contract specifications were numerous and frequent. It is reasonable to infer that at least some of the difficulties resulted from Minichillo’s having purchased its estimate instead of creating it based upon its own review of the contract requirements. The deficiencies were neither de minimus nor justified. They were excused, however.
While Lieb and the City put pressure on Cook to discharge the masons and complete the job itself, Cook kept Minichillo on the job despite Minichillo’s deficiencies and submitted requisitions to the Ci1y based upon Minichillo’s work.
Despite Lieb’s claims that he never accepted the mason’s work he did sign the payment requisitions which were submitted to the City and the City did accept most of it, allowing a certain level of tearing down and replacement, and accepting other defective work, in exchange for credits of about $13,200.
In all, Minichillo was paid $404,989.20 for work completed.
In the Application and Certificate for payment submitted to the City of Newton by the architect the status of masonry work was enumerated. Each requisition submitted by Cook for payment enumerated work performed for the payment period. In turn, Cook submitted requisitions to the City, certifying that work enumerated therein had been performed. Those documents also contained notations setting forth the percentage of completion of each part of the work.
Only after Minichillo was discharged from the site did it attempt to charge Cook for hoisting equipment. This charge was frivolous and not in accordance with the contract documents, which provided that Cook would provide hoisting, as required. Cook had available on the site a forklift and backhoe. Minichillo never asked to use Cook’s hoisting equipment.
Had Minichillo fully performed the contract and all extra work authorized by approved change orders, it would have been entitled to a total of $477,014.94 ($440,000.00 plus $37,014.94 = $477,014.94). Minichillo was never entitled to any labor or materials performed or supplied outside of the terms of the contract unless it was by an approved change order. In May and June 1987, Cook issued back charges to Minichillo of $485 for a dumpster and $1,703.83 for clean up costs Cook incurred. These were a fair and reasonable back charges. This figure reduces the total amount due to Minichillo to $474,826.11 ($477,014.90 - 2,188.83 = $474,826.11).
Payments in the total amount of $404,989.20 were made to Minichillo. Had the contract been performed fully, Minichillo would be owed $69,836.91 under the contract.
After Minichillo was terminated, Cook expended its own labor and materials to complete the masonry work. Peluso, Cook’s project manager, estimated that the value of the masonry work performed by Cook to complete Minichillo’s unfinished work was $100,000.00. This figure, however, was not sufficiently detailed or corroborated to be credible.
Based upon Cook’s requisition for the time period ending 2-29-88, indicating substantial completion of the masonry work (alterations were 97 percent complete, exterior work was 90% complete and interior walls were 95% complete), the court determines that the value of work left to be done by Cook was $30,700, based upon the percentage of work remaining to be done in each of the three categories of alterations, exterior veneer system, and interior walls (97%, 90% and 95% respectively), applied to the scheduled value of each category ($40,000; $190,000 and $210,000, respectively).
RULINGS OF LAW I. BREACH OF CONTRACT CLAIMS A. Minichillo vs. Cook
Minichillo seeks recovexy under G.L.c. 149, §29 which provides that:
[officers or agents contracting in behalf of any . . . city ... of the commonwealth ... for the construction, reconstruction, alteration, remodeling, repair or demolition of public buildings or other public works when the amount of the contract... is more than two thousand dollars, shall obtain security by bond ... for payment by the contractor and subcontractors for labor performed or furnished and materials used or employed therein . . .
In order to obtain the benefit of such bond for any amount claimed due and unpaid at any time, any claimant having a contractual relationship with the contractor principal furnishing the bond, who has not been paid in full for any amount claimed due . . . shall have the right to enforce any such claim (a) by filing a petition in equity . . . and (b) by prosecuting the claim thereafter by trial in the superior court to final adjudication and execution for the sums justly due the claimant as provided in this section.
*185 G.L.c. 149, §29. In essence, Minichillo claims Cook breached the contract between the parties and seeks to recover damages pursuant to this statute.
It is well established that “in relation to building contracts . . . , a contractor cannot recover on the contract itself without showing complete and strict performance of all its terms, but that, failing in such complete performance of the contract, he may recover on a quantum meruit, if he can prove both substantial performance of the contract and an endeavor on his part in good faith to perform fully, and the burden is upon him to prove both.” PDM Mechanical Contractors, Inc. v. Sifffolk Construction Co., 35 Mass.App.Ct. 228, 230-31, rev. denied, 416 Mass. 1107 (1993), quoting Andre v. Maguire, 305 Mass. 515, 516 (1940). Even though Cook terminated Minichillo, Minichillo “is not excused from proving substantial performance and an intention completely to perform up to the date that further performance is prevented by termination.” C.C.&T. Construction Co., Inc. v. Coleman Bros. Corp., 3 Mass.App.Ct. 372, 375 (1975).
Minichillo was bound to the precise terms of its contract with Cook. Joseph E. Bennett Co., Inc. v. Commonwealth 21 Mass.App.Ct. 321, 329 (1985). Since Minichillo did not complete the contract in strict conformance with its terms, Minichillo, cannot recover on the contract. E.g. Russo v. Charles J. Hosmer, Inc., 312 Mass. 231, 232 (1942); Glazer v. Schwartz, 276 Mass. 54, 56 (1931); PDM Mechanical Contractors, Inc. v. Sifffolk Construction Co., 35 Mass.App.Ct. 228, 230-31, rev. denied, 416 Mass. 1107 (1993).
Minichillo’s deviation from the contract’s specific provisions which were not only bars its recovery, Albre Marble & Tile Co., Inc. v. Goverman, 353 Mass. 546, 550 (1968), but justified Cook’s actions in terminating the contract. See Lease-It, Inc. v. Massachusetts Port Authority, 33 Mass.App.Ct. 391, 397 (1992) (material breach excuses other party from further performance under contract); Ward v. American Mut. Liberty Ins. Co., 15 Mass.App.Ct. 98, 101 (1983) (same).
Recognizing the onerous weight of the requirement of strict compliance as a precedent to recovery on a contract, courts have permitted recovery under a theory of quantum meruit where the plaintiff can prove both substantial compliance with the contract and a good faith effort to perform fully. J.A. Sullivan Corp. v. Commonwealth 397 Mass. 789, 797 (1986).
Minichillo has met its burden of proving by a fair preponderance of the credible evidence that it substantially performed the contract. Divito v. Uto, 253 Mass. 239, 243 (1925) (plaintiff has burden of proving substantial performance and good faith); C.C.&T. Construction Co., Inc. v. Coleman Bros. Corp., 3 Mass.App.Ct. 372, 375 (1975) (defendant does not have to prove plaintiffs failure to perform).
The second condition which must be met — that Minchillo endeavored in good faith to perform fully— is a closer question. It is axiomatic that absent special exculpating circumstances, “an intentional departure from the precise requirements of the contract is not consistent with good faith in the endeavor to perform it, and unless such departure is so trifling as to fall within the rule de minimis, it bars all recovery.” J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 797 (1986), quoting Andre v. Maguire, 305 Mass. 515, 516 (1940). In the instant case, Minichillo’s breaches did not result from a good faith misunderstanding about the contract’s requirements or from a mistaken belief of compliance with the contract’s terms. See The Hub Construction Co. v. Dudley Wood Works Co., 274 Mass. 493, 496 (1931) (finding breach of contract material so as to preclude recovery). However, the breaches were excused. Id. Cook would have been justified in terminating Minichillo earlier than March 1988; instead, Cook permitted Minichillo to continue on the job, despite numerous deficiencies in the quality of the work. Furthermore, Cook continued to bill the City for Minichillo’s work and received payment for same. These circumstances constitute excuse of performance sufficient to permit recovery under quantum meruit. The only credible evidence presented of the value of the work performed, but unpaid is $69,836.91, the balance due under the contract.
B. Cookv. Minichillo
Cook is entitled to damages on its counterclaims for breach of contract. “The fundamental principle of law upon which damages for breach of contract are assessed is that the injured party shall be placed in the same position he would have been in, if the contract had been performed, so far as loss can be ascertained to have followed as a natural consequence and to have been within the contemplation of the parties as reasonable men as a probable result of the breach, and so far as compensation therefor in money can be computed by rational methods upon a firm basis of facts.” John Hetherington & Sons. Ltd. v. William Firth Co., 210 Mass. 8, 21 (1911). Where a contractor willfully defaults in its performance under a contract, the measure of damages is the reasonable cost of completion, less any amount due the contractor. See Louise Caroline Nursing Home, Inc. v. Dix Construction Corp., 362 Mass. 306, 311 (1972) (injured parly entitled to reasonable cost of completing the contract deducting the amount of the contract price that has not been paid); White Spot Construction Corp. v. Jet Spray Cooler, Inc., 344 Mass. 632, 635 (1962) (injured parly entitled to be placed in the same position as if the contract had been performed). Minichillo breached its contract, and Cook is entitled to damages in the amount of $30,700 which represents the value of labor and materials Cook expended to complete the masonry work.
*186 II. CLAIMS PURSUANT TO G.L.c. 93A A. Minichillo’s c. 93A Claim
Both Cook and Minichillo seek redress for each other’s actions pursuant to G.L.c. 93A, §§2 and 11. Section 2 declares unlawful “[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.” G.L.c. 93A, §2. Section 11 provides redress for “[a]ny person who engages in the conduct of trade or commerce and who suffers any loss of money or property ... as a result of the use or employment by another person who engages in any trade or commerce of... an unfair or deceptive act or practice . . .” G.L.c. 93A, §11.
To recover under the statute, a claimant must prove not only the existence of an unfair or deceptive act, but also that such act caused substantial injury. E.g. Massachusetts Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc., 403 Mass. 722, 730 (1989) (no recovery under chapter 93A, section 11 where evidence of a causal relationship between the alleged unfair acts and the claimed loss was lacking); PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975) (noting requirements of causation and injury). In proving the existence of an unfair or deceptive act, the chapter 93A claimant must demonstrate that “the defendant’s actions fell ‘within at least the penumbra of some common-law, statutoiy, or other established concept of unfairness,’ or were ‘immoral, unethical, oppressive or unscrupulous,’ ” PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975); accord Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 502 (1979).
Breach of a contract, by itself, does not automatically constitute unfair or deceptive practices within the meaning of the statute. See Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 100-01 (1979) (allegations of breach of commercial agreement held insufficient to support a claim under chapter 93A); Canal Elec. Co. v. Westinghouse Elec. Corp., 756 F.Supp. 620, 627 (D.Mass. 1990) (mere contractual breach, without more, does not contravene chapter 93A). In any event, since Cook justifiably terminated Minichillo, Minichillo cannot recover for unfair practices incident to that breach of the contract. Cook’s failure to pay Minichillo under a quantum meruit theory is not such a course of action as would raise an eyebrow of those engaged in the construction industry and thus does not constitute an unfair and deceptive practice.
B. Cook’s c. 93A Claim
Cook’s claim under chapter 93A is based upon Minichillo’s conversion of bricks. Minichillo’s conversion of bricks, albeit temporary, constituted an unfair and deceptive trade practice under §11, Hanner v. Classic Auto Body, Inc., 10 Mass.App.Ct. 121, 122-23 (1980). However, Cook failed to adduce any evidence at trial which demonstrated any loss resulting from the conversion. Consequently, Cook is also precluded from recovering under its chapter 93A claim. Massachusetts Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc., 403 Mass. 722, 730 (1989).
III. COOK’S COUNTERCLAIM FOR CONVERSION
Finally, Cook’s prompt recovery of the bricks taken by Minichillo renders its claim for conversion moot. In any event, Cook proved no damage as a result of the conversion.
ORDER FOR JUDGMENT
1. Judgment shall enter for plaintiff Minichillo, on its quantum meruit claim in the amount of $69,836.91.
2. Judgment shall enter for the defendant, Cook, on its counterclaim for breach of contract in the amount of $30,700.
3. Judgment shall enter for the defendant, Cook on Minichillo’s claim under G.L.c. 93A.
4. Judgment shall enter for the plaintiff, Minichillo, on defendant Cook’s counterclaim under G.L.c. 93A.
5. Judgment shall enter for the plaintiff, Minichillo, on defendant Cook’s counterclaim for conversion.

When reference is made to Pasquale Minichillo, the individual, his full name will be used.

Minichillo’s project manager and estimator, Martin DeSantis (Pasquale Minichillo’s brother-in-law), did not do the estimate on which the subcontract was based; instead, he purchased it from another professional estimator.

Underlined portions were typed onto the printed subcontract form.

In the Supplementary Conditions of the main contract the following appears:
15.3.1. Prior to the date of Substantial Completion of the Work as stipulated in the Agreement, the Owner shall have the right to the occupancy and/or use of all portions of the building provided the Owner’s occupancy and use of such spaces, in the opinion of the Architect, does not unduly interfere with the contractor’s operations. The time of occupancy, the location and extent of the portions to be occupied shall be determined by the Architect, and as coordinated with both the Construction and Phasing Schedulels. [sic] (Emphasis represents information typed onto printed form.)

As built by Minichillo, there are three different kinds of mortared joints, which was not in conformance to the specifications requiring uniform joints.

In the fall of 1987, Minichillo had begun two other construction projects, for Digital and Osgood Mills. There were insufficient numbers of masons to staff all of the ongoing projects. At this point, Minichillo’s superintendent, with a few exceptions, ceased keeping a record of staffing on the Newton project.