**PLAY TIME, INC., Appellee,**

v.

**LDDS METROMEDIA COMMUNICATIONS, INC., a/k/a WorldCom, Inc. or WorldCom, Appellant.**

No. 96–2066.

United States Court of Appeals, First Circuit.

Heard May 7, 1997.

Decided Aug. 12, 1997.

Joan A. Lukey, Boston, MA, with whom Anthony A. Scibelli and Hale and Dorr, LLP were on brief, for appellant.

Kenneth L. Kimmell, Boston, MA, with whom Erin M. O'Toole and Bernstein, Cushner & Kimmell, P.C. were on brief, for appellee.

Before TORRUELLA, Chief Judge, CYR, Senior Circuit Judge, and STAHL, Circuit Judge.

CYR, Senior Circuit Judge.

Defendant-appellant WorldCom challenges a district court judgment awarding damages

for breach of its agreement to assign plaintiff-appellee Play Time, Inc. ("Play Time") a toll-free "800" vanity number. We affirm the district court judgment in all respects.

# I

## BACKGROUND [1]

WorldCom, a corporation with its principal place of business in Jackson, Mississippi, and an office in Revere, Massachusetts, provides subscribers with specialized long-distance services, including toll-free "800" numbers.[2] Pursuant to industry standards, toll-free "800" numbers are stored in a central database known as the 800 Service Management System ("SMS/800"). All "800" numbers are reserved and assigned to subscribers by so-called Responsible Organizations ("RESP ORGs") through SMS/800.

In March 1994, Play Time, a Massachusetts-based, family-owned corporation engaged in selling art supplies, was endeavoring to expand into nationwide telephonic networking aimed at the commercial real estate leasing market. Michael Levosky, a Play Time shareholder and co-manager, envisioned a nationwide referral service through which potential customers could call a toll-free "800" number and enter information into an automated call router which would link the caller to a real estate office near the place the caller wanted to lease commercial real estate. Play Time would generate income from the fees charged real estate brokers for their advertising and usage of the toll-free "800" number.

To that end, Play Time set out to obtain a suitable vanity number, one whose alphabetical counterpart conveyed a business message readily identified and remembered by targeted customers. Levosky decided to obtain 1–800–"367–5327" ("the Number"), which would transpose as "FOR–LEAS[E]." WorldCom advised Levosky that the Number, though not then in use, was expected to become available a few weeks later, on or about April 20, 1994.[3]

Levosky called the WorldCom office in Revere, Massachusetts, which handled other telephone business for Play Time, and spoke with the "800" coordinator, Martha Burton, who confirmed that the Number would become available in mid-April. Burton assured Levosky that she would obtain the Number through SMS/800 and assign it to Play Time once it attained "spare" status.

On April 20, 1994, one week after WorldCom became the RESP ORG for the Number, and the day the Number was to revert to "spare" status, Levosky reminded WorldCom to assign the Number to Play Time.[4] Notwithstanding that WorldCom had been designated the RESP ORG for the Number, however, it did not do so. Levosky called WorldCom frequently between April 20 and May 10, 1994, to ascertain why the Number had not yet been assigned to Play Time, only to be told essentially that WorldCom was checking into it.

On May 11, 1994, Levosky called Joseph Shannon, a senior account executive in WorldCom's Revere office, who assured Levosky that the Number could be assigned to Play Time once the appropriate paperwork

---

1. "We recite the facts as the jury and district court could have found them." *Roche v. Royal Bank of Canada*, 109 F.3d 820, 821 (1st Cir. 1997).

2. At the time of the relevant events, its corporate name was LDDS Metromedia Communications, Inc.

3. The SMS/800 system records the status of all "800" numbers. Normally, "800" numbers fall into one of five main categories: "assigned," "working," "spare," "disconnect," or "unavailable." After a subscriber advises that it no longer needs a particular "800" number, the number is allowed to age for approximately six months before reverting to "spare" status. Only num-

bers in "spare" status are immediately available to the next subscriber. A number in "spare" status is not assigned to any particular RESP ORG, but can be assigned to a subscriber by any RESP ORG simply by reserving it with SMS/800. Once an "800" number has been assigned to a particular RESP ORG, however, no other RESP ORG can control its status.

4. Any RESP ORG may reserve a number in "spare" status directly through SMS/800. The number is then "reported to" that RESP ORG, in "reserve" status. At all times relevant to this appeal, a number could remain in reserve status for up to 60 days. Thereafter, it automatically reverted to "spare" status unless it had achieved "assigned" or "working" status.

had been completed. Levosky promptly executed the required documents and returned them to Shannon the same day; Shannon faxed them to the WorldCom RESP ORG office in San Antonio on May 12.

Although the WorldCom fax machine in the Revere office printed a receipt reflecting that the fax had been received in San Antonio on May 12, when Shannon called the San Antonio office on May 13 he was informed that the documents had never been received. Once again Shannon faxed the documents. Although the second set of documents was received in San Antonio on May 13, as confirmed by telephone, still the Number was not assigned to Play Time. Shannon was told the delay was due to difficulty in getting the Number released from SMS/800, notwithstanding the fact that WorldCom was already the RESP ORG for the Number. *But see supra* note 3.

Meanwhile, one Michael Eisemann had asked a WorldCom office in Indiana to obtain the Number for his real estate business. Eisemann intended to use the Number in a nationwide referral system similar to that envisioned by Levosky. On May 20, 1994, approximately two months after Levosky first made a verbal request for the Number and nine days after Levosky's first written request, Eisemann submitted the order to the WorldCom office in Indiana, with the required paperwork. Levosky's earlier requests notwithstanding, WorldCom assigned the Number to Eisemann, because its Revere office had never entered Play Time's request into SMS/800.

Unaware that Eisemann had obtained the Number, Levosky continued to inquire into its status. Although Levosky was told there had been some delay due to paperwork problems, Shannon advised him that the problems had been resolved and the Number would soon be assigned to Play Time. On May 26, Levosky dialed the Number to determine whether it would ring at Play Time's office. The call was answered instead by an employee in a Detroit, Michigan, maintenance office. Whereupon Levosky contacted WorldCom, only to be informed that there had been a computer "glitch."

Although WorldCom switched the Number to Play Time on May 27, by May 31 it was once again ringing at the Detroit maintenance office. The Number changed hands between Levosky and Eisemann four more times between May 31 and June 2, ultimately remaining with Eisemann. On June 2, Shannon tracked down the Indiana sales representative responsible for assigning the Number to Eisemann, and learned for the first time that Eisemann too had requested the Number. After Shannon informed Levosky of the problem, Levosky complained that WorldCom originally had retrieved the Number from SMS/800 at his request, more than two months earlier. Levosky then asked WorldCom to disconnect the Number pending an investigation.

Shannon and his supervisor, Charles Hurd, approached senior WorldCom management in the Revere office, urging that the Number be returned to Play Time. Hurd informed Brady Buckley, Vice President of sales for the eastern region, that the Number had been taken from Play Time. Buckley asked Hurd how much money the Number could be expected to produce. Hurd was unable to answer the question. Buckley finally told Hurd: "F——— it[;]" "leave it alone."

Upon learning that the Revere office was unable or unwilling to assist him further, Levosky contacted Deborah Surrette, WorldCom Vice President for the Northeast region. When Levosky explained why the Number was so important to Play Time, Surrette promised to investigate the matter and get back to him. Surrette asked Kelle Reeves, director of customer provisioning and RESP ORG, to determine whether WorldCom policy had been followed in regard to the Number. After speaking with several people, but without attempting either to contact the Revere office or to ascertain which customer had first *requested* the Number, Reeves simply concluded that WorldCom had complied with industry guidelines requiring "800" numbers to be allocated on a "first-come, first-served" basis, as Eisemann's request had been the first to be entered into SMS/800.[5]

5. Industry guidelines provide that: "Specific 800    Number requests are honored based on availabil-

Levosky continued to urge WorldCom to return the Number to Play Time, but was told that industry guidelines prohibited its reassignment. *See supra* note 5. Levosky nevertheless maintained that Play Time had been the first to request the Number. WorldCom then altered course, explaining that its relationship with Levosky was *not* controlled by industry guidelines, which govern only the relationship between a RESP ORG and SMS/800.

At that point, WorldCom wrongly represented to Levosky that the problem had been caused by AT & T. According to WorldCom, AT & T had been the RESP ORG for the Number on the date Play Time requested it, but had released the Number to "spare" status rather than assigning it to WorldCom. To the contrary, however, AT & T was never the RESP ORG for the Number after 1993. Rather, as we have noted, WorldCom itself had been the designated RESP ORG since April 13, 1994.

Finally, WorldCom informed Levosky that the documents he had submitted through Shannon, *see supra* pp. 25–26, had not been received by its San Antonio office until after the May 20th request from Eisemann, even though a WorldCom employee in San Antonio had confirmed receipt of the Levosky paperwork on May 13. Play Time brought suit against WorldCom on November 9, 1994, demanding damages and specific performance. Shortly after Eisemann was named an indispensable party in relation to the specific performance claim—because he still controlled the Number—he changed long-distance carriers to prevent WorldCom from returning the Number to Play Time.

Play Time then offered Eisemann an immediate $5,000 non-refundable deposit and an additional $45,000 following trial, in return for the Number. At the same time, it offered to dismiss its action against Eisemann if he would testify to the value of the Number. Eisemann countered with a demand for a $10,000 non-refundable deposit and $40,000 after trial. Their negotiations ultimately fell through because Play Time could not come up with the additional $5,000 non-refundable deposit.

Eisemann nevertheless testified at trial that the Number did have inherent value, explaining that "people would buy the [vanity] number for [its] potential value." He produced a pamphlet he had developed for marketing the Number, touting the importance of vanity numbers in reaching potential customers. Although Eisemann acknowledged that he was motivated to enter into an agreement with Levosky in part because he wanted to get Levosky "out of his hair," he consistently maintained that the Number had inherent value.

The jury returned verdicts for Play Time on all counts, awarding $50,000 in damages on each count, representing the value of the Number under a "willing-transferor-willing-transferee" standard. The total award was limited to $50,000, however, because the jury determined that recovery under more than one count would be redundant.

At a later hearing, the presiding judge found that WorldCom had violated Mass. Gen. Laws ch. 93A, § 11, which affords civil relief from unfair or deceptive business practices. The court determined WorldCom's conduct both unfair and deceptive, and held that it had occurred "primarily and substantially" within Massachusetts. Accordingly, the court trebled the $50,000 damages award made by the jury, *see* Mass. Gen. Laws ch. 93A, § 11 (1984), and awarded attorney fees and costs under Mass. Gen. Laws ch. 93A and the Federal Communications Act. Finally, the equitable claim for specific performance was dismissed as moot. WorldCom promptly appealed from the $233,334.84 judgment.

## II

### DISCUSSION

### 1. *Jury Instructions and Verdict Form*

■ WorldCom claims the district court erred in instructing the jury to apply a "willing-transferor-willing-transferee" standard

---

ity, on a first-come, first-served basis, at the time the reservation request is initiated by a RESP ORG into SMS/800." Industry Guidelines for

800 Number Administration, 2.3.1 (Issue 3.0, December 1, 1993).

for measuring damages. It maintains that "800" numbers are without inherent value as a matter of law, since it would violate industry guidelines and public policy to allow telephone numbers to be bought and sold on the open market.

Throughout the trial, Play Time made it very clear that it was demanding the value of the Number. Early on, the district court set itself to the task of articulating an appropriate measure of damages. WorldCom voiced no objection to the district court's proposed articulation of the measure of damages until after the close of the evidence. At that time, its trial counsel offered two cursory observations.

First, WorldCom stated that the measure of damages on the negligence claim should be different from that on the contract claim. Its second observation appears in the following exchange:

*WorldCom: Your Honor,* just *for the record, I haven't made any comments on the willing-assignor-willing-assignee theory.* I just wanted to reflect what the record so far reflects, that by not making any comments on it, I don't adopt it as—

*The Court:* Well, you'll have the opportunity to make objection.

*WorldCom:* Yes.

*The Court: But if you've got any alternative way of dealing with this matter,* of course *I want to hear it now.*

*WorldCom:* Right. *I don't think I do other than* simply *to ask you to instruct* the jury *in accordance with my requested instruction* on damages, and I expect that's what I'll simply do after closings. (Emphasis added.)

The record on appeal neither contains a proposed instruction by WorldCom nor reflects the grounds for its objection to the instruction given by the district court.

The special verdict form included a statement of the issues relating to the "willing-transferor-willing-transferee" standard, as follows:

1(c). What amount of money, if any, do you find to be fair and reasonable compensation, of each of the following types, for

... breach ... of contract? Answer in DOLLARS or NONE.

(1) Reimbursement of losses proved by a preponderance of the evidence to have been out-of-pocket expenses.

(2) Fair market value (as valued by the willing-transferor-willing-transferee standard) of a transfer, by Eisemann to Play Time, on or about September 21, 1995, of Eisemann's rights to use the number 800-367-5327.

The same formula was used for the contract, negligence, and Federal Communications Act claims.

The presiding judge explained the "willing-transferor-willing-transferee" standard to the jury as follows:

The willing transferor and willing transferee are hypothetical persons created by the law to help us decide questions of valuation in circumstances in which no real persons have arrived at an exact value for the property or property rights at issue. You, as decisionmakers on this question of value, are directed to envision not the usual arm's-length transactions between real-life bargainers, but instead a transaction of the hypothetical variety—indeed of a contrary to fact variety. If the reality is that in human experience a property interest exactly like that transferred in this case has not been transferred in an arm's-length transaction between real people, you must imagine a transaction not exactly like any transaction described in the evidence before you.

These hypothetical persons, the willing transferor and willing transferee, always come to an agreement. They never end their negotiations in failure. They always arrive at a value they both agree upon.

The aim of factfinding by using this willing-transferor-willing-transferee standard is to help you evaluate the parties' evidence, and their arguments about evidence and about formulas and figures, and about other factors in evidence that bear upon the issue of value. You are to do your evaluation in the way you find the willing transferor and willing transferee would evaluate the same factors and arguments.

To these persons different formulas suggested by opposing parties are not binding. They are only tools. The willing transferor and willing transferee do not overlook relevant evidence. They weigh every relevant factor. They are not experts, but they are attentive to expert advice. But in the end they make a pragmatic decision that enables them to come to a common value after evaluating all of the evidence and arguments before them.

After the jury charge had been delivered, the presiding judge invited objections to the charge and the special verdict form. At that point, WorldCom simply registered its objection to the "instruction on the measure of damages" relating to the "willing-transferor-willing-transferee" standard. The district court overruled the objection.

■ Objections to jury instructions are governed by Fed.R.Civ.P. 51, which provides in relevant part that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, *stating distinctly the matter objected to and the grounds of the objection.*" Fed.R.Civ.P. 51 (emphasis added). We have "consistently held that the strictures of Rule 51 must be followed without deviation." *Smith v. Massachusetts Inst. of Tech.,* 877 F.2d 1106, 1109 (1st Cir.1989). *See also Kerr–Selgas v. American Airlines, Inc.,* 69 F.3d 1205, 1213 (1st Cir.1995).[6]

■ Assignments of error duly preserved pursuant to Rule *51* are subject to the "harmless error" regime set out in Rule *61,* which *requires* the reviewing court to "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Fed.R.Civ.P. 61.[7] Absent strict compliance with Rule 51, however, appellate challenges to a jury charge or verdict form cannot succeed unless the assigned error "caused a miscarriage of justice or … undermined the integrity of the judicial process." *Scarfo v. Cabletron Systems, Inc.,* 54 F.3d 931, 940 (1st Cir.1995); *see also Lash v. Cutts,* 943 F.2d 147, 152 (1st Cir.1991) ("Absent timely objection, an erroneous jury instruction warrants a new trial only in the exceptional case where the error seriously affected the fairness, integrity or public reputation of judicial proceedings." (internal quotation marks omitted)); *Elwood v. Pina,* 815 F.2d 173, 176 (1st Cir.1987). The latter standard—"plain error"—*see Transamerica Premier Ins. Co. v. Ober,* 107 F.3d 925, 933 (1st Cir.1997); *Kerr–Selgas,* 69 F.3d at 1213; *Elgabri v. Lekas,* 964 F.2d 1255, 1259 (1st Cir.1992); *Elwood,* 815 F.2d at 176, " 'is near its zenith in the Rule 51 milieu.' " *Clausen v. Sea–3, Inc.,* 21 F.3d 1181, 1196 (1st Cir.1994) (quoting *Toscano v. Chandris, S.A.,* 934 F.2d 383, 385 (1st Cir.1991)).

■ Rule 51 requires a punctual objection identifying "distinctly the matter objected to and *the grounds of the objection.*" Fed. R.Civ.P. 51 (emphasis added). Here, however, WorldCom interposed no record objection to the special verdict form, as distinguished from the jury charge defining "the measure of damages." Moreover, WorldCom articulated no *grounds* whatsoever for its objection to the special verdict form or the jury charge.

Failure to object with the requisite particularity forfeits review *under the "harmless error" rule.* See *Scarfo,* 54 F.3d at 944; *Linn v. Andover Newton Theological School, Inc.,* 874 F.2d 1, 5 (1st Cir.1989); *Elwood,* 815 F.2d at 175–76; *New York, N.H. & H.R. Co. v. Zermani,* 200 F.2d 240, 245 (1st Cir. 1952). Consequently, appellate review is lim-

---

6. The Rule 51 standard applies to the jury charge and any special verdict form. *See Transamerica Premier Ins.Co. v. Ober,* 107 F.3d 925, 933 (1st Cir.1997); *Clausen v. Sea–3, Inc.,* 21 F.3d 1181, 1195–96 (1st Cir.1994).

7. WorldCom insists that the jury instruction must be reviewed *de novo.* Although we exercise "independent judgment in evaluating the legal correctness of the district court's jury instructions," *Data General v. Grumman Systems Support,* 36 F.3d 1147, 1159 (1st Cir.1994), and may review

the special verdict form for abuse of discretion, *see Transamerica Premier Ins. Co. v. Ober,* 107 F.3d 925, 933 (1st Cir.1997), a party which has complied with Rule 51 nonetheless must show that the assigned error affected "substantial rights," *see* Fed.R.Civ.P. 61, whereas a party which has not complied with Rule 51 must demonstrate a "miscarriage of justice." *See Scarfo v. Cabletron Systems, Inc.,* 54 F.3d 931, 940 (1st cir.1995).

ited to determining whether a miscarriage of justice would occur were the asserted error not corrected. *See Scarfo*, 54 F.3d at 940. WorldCom can demonstrate no miscarriage of justice.

■■■ First, the "fair market value" standard defined by the district court, *see supra* 28–29, provided the jury with a just and reasonable measure of damages under Massachusetts law in these circumstances. *See Mechanics Nat'l. Bank of Worcester v. Killeen*, 377 Mass. 100, 384 N.E.2d 1231, 1239 (1979) (holding, in action for breach of contract caused by wrongful foreclosure and sale of shares of stock, plaintiff was "entitled to recover the fair market value of the stock at the time of its sale"); *Hall v. Paine*, 224 Mass. 62, 112 N.E. 153, 155 (1916) (holding that "fair market value" was proper measure of damages for stock broker's breach of margin agreement caused by sale of plaintiff's shares without authorization; noting that, generally speaking, fair market value is proper measure of damages for breach of contract relating to sale of goods which have an ascer-

tainable value on the market). Thus, at the very least, the "fair market value" standard articulated by the district court effectively foreclosed WorldCom's claim of error under the "plain error" ("miscarriage of justice.") standard.[8] The failure [to] instruct the jury on a measure of damages other than the fair market value cannot meet either standard, however, especially since the challenged instruction outlined a fair and reasonable measure of damages, and no other standard was proposed below.

WorldCom misses the mark with its argument that the Number had no market value because its sale, brokering, barter, or release for a consideration was prohibited.[9] Quite the contrary, the pertinent Industry Guideline explicitly acknowledges the ultimate right of "800 Service End–User Subscriber[s] ... to control their 800 Service, and their reserved, active, or assigned 800 Service Numbers." Industry Guidelines for 800 Number Administration 2.2.1, ¶ 3 (Issue 3.0, December 1, 1993).[10] Instead, industry

---

8. Under the harmless error rubric, trial court error affects "substantial rights" only if it results in substantial prejudice or has a substantial effect on the outcome of the case. *See Lataille v. Ponte*, 754 F.2d 33, 37 (1st Cir.1985) (defining harmless error, in context of challenge to admission of evidence, as "whether we can say 'with fair assurance ... that the judgment was not substantially swayed by the error'" (quoting *United States v. Pisari* 636 F.2d 855, 859 (1st Cir.1981)) (alteration in original)). *See also* 12 James Wm. Moore et al., Moore's Federal Practice § 61.02[2] (3d ed.1997). In order to satisfy the "plain error" standard of review ("miscarriage of justice"), however, an appellant must show "more than the simple individualized harm which occurs whenever a litigant's failure to object ... alters the outcome of a trial." 9 Moore's Federal Practice § 51.21[2]. Among the factors to be considered are: whether the failure to raise the claim below deprived the reviewing court of helpful factfinding; whether the issue is one of constitutional magnitude; whether the omitted argument is highly persuasive; whether the opponent would suffer any special prejudice; whether the omission was inadvertent or deliberate; and, perhaps most importantly, whether the issue is of great importance to the public. *See National Ass'n of Social Workers v. Harwood*, 69 F.3d 622, 627–28 (1st Cir.1995) ("legislative immunity" defense considered on appeal despite failure to raise it below). *See also* 9 Moore's Federal Practice § 51.21[2]. Our case, which implicates only the question of damages for breach of a private agreement between the litigants,

presents no issue of great public importance or constitutional magnitude; the *Harwood* factors, therefore, weigh in favor of Play Time. Nor does the present case implicate the integrity of the judicial process, as the proceedings below were conducted with meticulous attention to the rights of both parties. *See Scarfo*, 54 F.3d at 940.

9. The relevant industry guideline provides:

800 numbers are not to be treated as commodities which can be bought or sold and no individual or entity is granted a proprietary interest in any 800 number assigned. RESP ORGs and 800 Service Providers are prohibited from selling, brokering, bartering, or releasing for a fee (or other consideration) any 800 number.
Reserving, Assigning, or activating (Working) 800 *Numbers* by RESP ORGs, 800 Service Providers, or Customers for the primary purpose of selling, brokering, bartering, or releasing for a fee (or other consideration) that 800 *Number* is prohibited.
However, the 800 Service End–User Subscriber has the ultimate right to control their 800 Service, and their reserved, active, or assigned 800 Service Numbers.
Industry Guidelines for 800 Number Administration 2.2.1 (Issue 3.0, December 1, 1993).

10. Similarly, the WorldCom tariff provided that subscribers have "no ownership interest or proprietary right in any particular 800 number," but

guidelines prohibit only RESP ORGs and "800" Service Providers from trading "800" numbers for valuable consideration. *Id.* 2.2.1, ¶ 1. Subscribers, on the other hand, are prohibited only from obtaining "800" numbers for the *primary purpose* of trading in them. *Id.* 2.2.1, ¶ 2.

Thus, industry guidelines did not impede, let alone foreclose, a jury finding that the right to control the Number had inherent value in the marketplace. Consequently, WorldCom failed to establish that any right to use the Number was valueless as a matter of law, let alone that any "error seriously affected the fairness, integrity or public reputation of judicial proceedings." *Lash,* 943 F.2d at 152 (internal quotation marks omitted).

### 2. Judgment as a Matter of Law [11]

■ WorldCom also challenges the district court ruling denying its motion for judgment as a matter of law. *See* Fed.R.Civ.P. 50. It assigns two errors: (i) Play Time failed to establish recoverable damages, and (ii) sustained no damages from any WorldCom negligence. As WorldCom maintains that Play Time failed to prove to a reasonable certainty that it sustained any damages as a result of its failure to assign the Number to Play Time, we must inquire whether Play Time presented enough evidence to enable a reasonable jury to determine, to the requisite degree of certainty, the value of the Number.[12]

Our inquiry is guided by Massachusetts law:

The fundamental principle of law upon which damages for breach of contract are assessed is that the injured party shall be placed in the same position he would have been in, if the contract had been performed, so far as loss can be ascertained to have followed as a natural consequence and to have been within the contemplation of the parties as reasonable men as a probable result of the breach, and so far as compensation therefor in money can be computed by rational methods upon a firm basis of facts....

*John Hetherington & Sons, Ltd. v. William Firth, Co.,* 210 Mass. 8, 95 N.E. 961, 964 (1911). *See also Hendricks & Assocs., Inc. v. Daewoo Corp.,* 923 F.2d 209, 213 (1st Cir. 1991) (applying *Hetherington* ). Thus, it was incumbent upon Play Time to establish a firm evidentiary foundation for the damages claimed, leaving no essential element to " 'conjecture, surmise or hypothesis.' " *Snelling & Snelling of Mass. Inc. v. Wall,* 345 Mass. 634, 189 N.E.2d 231, 232 (1963) (quoting *Hetherington,* 95 N.E. at 964). *See also Air Safety, Inc. v. Roman Catholic Archbishop of Boston,* 94 F.3d 1, 4 (1st Cir. 1996); *Hendricks,* 923 F.2d at 217.

Ample record evidence supported the $50,000 valuation. Eisemann testified, based on his considerable experience in the real estate leasing field, that the Number, like other vanity numbers, had inherent value for which would-be users were willing to pay. In addition, Eisemann and Levosky testified to their efforts to close the deal whereby Levosky was to acquire from Eisemann the right to use the Number at the agreed $50,000 price. Although their deal could not be consummated, it was not due to their inability to agree on value: Levosky offered $50,000 for the Number; Eisemann was amenable to accepting $50,000, but wanted a larger downpay-

explicitly stated also that "upon placing a number actually and substantially in use ... [World-Com] 800 Service Customers do have a controlling interest in this [sic] 800 number(s)." Tariff F.C.C. No. 2, C.3.3.3 (February 7, 1994).

**11.** Appellate challenges under Rule 50 face a formidable hurdle:

Review of [a] denial of a motion for judgment as a matter of law is plenary.... [W]e review the record in the light most favorable to the non-moving party. We will reverse the denial of such a motion only if reasonable persons could not have reached the conclusion that the jury embraced.

*Ansin v. River Oaks Furniture, Inc.,* 105 F.3d 745, 753 (1st Cir.1997) (internal quotation marks omitted), *petition for cert. filed,* 65 U.S.L.W. 3839 (U.S. June 10, 1997) (No. 96–1969).

**12.** WorldCom resurfaces its jury instruction challenge—that the Number had no inherent value, *see supra* 27–28; hence, Play Time established no recoverable damages. As the Number was not valueless as a matter of law, *see supra* 30–31, its

ment, which Play Time was unable to manage.

WorldCom focuses on an admission by Eisemann that he was motivated, in part, to release his rights to the Number in order to get Levosky, who had named him as a party defendant in the lawsuit, "out of his hair." WorldCom relies also on a letter from Play Time's counsel to Eisemann, which provided in relevant part:

> My client, Play–Time, offers to enter into an option agreement whereby Play–Time pays you (or the entity that controls the Number, if different from you), $5000.00 for the option to purchase the right to use the Number for a total of $50,000.00 (i.e., $45,000.00 plus the $5000.00 down payment). *In addition, Play–Time would waive its claims against you for specific performance, in exchange for your full cooperation in providing credible testimony as to the fair market value of the Number*, the details of which can be worked out later.

(Emphasis added.) WorldCom argues that this letter makes it clear that at least a portion of the $50,000 agreed upon by Eisemann and Levosky represented the value of Play Time's agreement to drop its lawsuit against Eisemann.

Although WorldCom proposes an entirely reasonable interpretation, another is that the letter memorializes two distinct offers: the first to pay a total of $50,000 for Eisemann's rights in the Number; the second to drop the claims against Eisemann in exchange for Eisemann's trial testimony as to the value of the Number. Thus, the WorldCom contention that the $50,000 figure had not been based entirely on the value of the Number did not preclude a reasonable jury finding to the contrary. Accordingly, we conclude that the evidence on damages was adequate to withstand the WorldCom motion for summary judgment, and that the district court committed no error in submitting the case to the jury.[13]

### 3. *Mass. Gen. Laws ch. 93A, § 11*

■ Finally, WorldCom contends that the district court erred in awarding Play Time treble damages under Mass. Gen. Laws ch. 93A, § 11. Chapter 93A generally proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2 (1984). An unfair or deceptive practice between businesspeople is not actionable under section 11 unless "the actions and transactions constituting the alleged unfair method of competition or the unfair act or practice occurred primarily and substantially within the commonwealth." Mass. Gen. Laws ch. 93A, § 11 (West Supp. 1996). WorldCom contends that any unfair action in this case did not occur "primarily and substantially" within Massachusetts.

The trial court findings on the "nature, extent, and place of performance" of World-Com's actions are reviewed for clear error only. *Clinton Hosp. Ass'n. v. Corson Group, Inc.*, 907 F.2d 1260, 1264 (1st Cir.1990). On the other hand, the district court's ruling that WorldCom failed to carry its burden of proving that its conduct "primarily and substantially" occurred outside Massachusetts, *see* Mass. Gen. Laws ch. 93A, § 11, raises a question of law for *de novo* review. *Roche v. Royal Bank of Canada*, 109 F.3d 820, 829 (1st Cir.1997); *see also Clinton Hosp.*, 907 F.2d at 1264.

In determining that WorldCom's actions were unfair and deceptive, the district court focused especially on the conduct of Joseph Shannon, which it considered entirely appropriate *but for* WorldCom's extant agreement with Levosky. The court also relied on the testimony of Charles Hurd, Shannon's supervisor, who expressed the view that World-Com management had mistreated Play Time. Finally, the court identified the off-color remark by Brady Buckley, *see supra* p. 26, as "perhaps the most dramatic demonstration of [WorldCom]'s thumb-their-nose attitude."

---

claim must be rejected in the present context as well.

**13.** Alternatively, WorldCom homes in on the Play Time negligence claim, arguing that there can be no recovery for negligence unless Play Time sus-

tained injury to its "person" or property. We need not discuss this argument, however, as the $50,000 damages award is sustainable simply on the breach of contract claim. *See, e.g., Hubbard v. Faros Fisheries, Inc.*, 626 F.2d 196, 201 n. 3 (1st Cir.1980); *see also supra* pp. 27–28.

As the district court determined, all these actions took place entirely within Massachusetts. The district court further found that the investigation conducted by Deborah Surrette and Kelle Reeves amounted to mere "window dressing," thereby enhancing the deceptiveness and unfairness to Play Time.

WorldCom mounts no serious challenge to these district court findings. Instead, it argues that most of the allegedly unfair and deceptive conduct took place outside Massachusetts. In particular, it accurately points out that the Number was assigned to Eisemann by a salesperson in Indiana and that the ultimate decision to allow Eisemann to retain the Number was made in New Jersey.

The Supreme Judicial Court has outlined a "pragmatic, functional approach," *Roche*, 109 F.3d at 829; *see also Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.*, 25 Mass.App. Ct. 302, 518 N.E.2d 519, 523–24 (1988), *further app. rev. denied*, 402 Mass. 1101, 521 N.E.2d 398 (1988), for determining whether alleged misconduct occurred "primarily and substantially" in Massachusetts. *See Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662, 672 (1985).[14] Its approach has been distilled into three principal inquiries: "(1) where the defendant committed the deception; (2) where plaintiff was deceived and acted on the deception; and (3) the situs of plaintiff's losses due to the deception." *Roche*, 109 F.3d at 829; *see also Clinton Hosp.*, 907 F.2d at 1265–66; *Bushkin*, 473 N.E.2d at 672. As we noted in *Clinton Hospital*, however, in approaching the second *Bushkin* inquiry the location of the person *to whom* the deceptive statements are made is of special significance, as distinguished from the location of the person *who uttered* the deceptive statements, since "[t]he victim's ingestion of a deceptive statement and the subsequent effects from reliance on it are what give the deceptive statement its

venomous sting." *Clinton Hosp.*, 907 F.2d at 1265–66.

The district court analyzed only the first *Bushkin* factor, finding that the conduct on which it focused—in particular, the actions of Joseph Shannon and Brady Buckley, *see supra* p. 25–26—all took place in Massachusetts. We have explained, however, that the first *Bushkin* factor is the least weighty. *Roche*, 109 F.3d at 829; *see also Compagnie De Reassurance D'Ile De France v. New England Reinsurance Corp.*, 57 F.3d 56, 90 (1st Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 564, 133 L.Ed.2d 490 (1995); *Clinton Hosp.*, 907 F.2d at 1265–66. Although we agree with the district court, other weightier factors cut against WorldCom as well. All the unfair or deceptive statements made by WorldCom's agents were visited upon Play Time in Massachusetts. It was there that Levosky dealt with Joseph Shannon; learned that WorldCom's Revere office would not try to retain the Number for Play Time because Buckley believed any potential revenues were inconsequential; learned the results of Surrette's superficial investigation; and was provided with the numerous pretexts by WorldCom for not obtaining the Number for Play Time.

WorldCom, on the other hand, misplaces primary reliance on the location of the WorldCom agents who made the ultimate adverse decision (Surrette and Reeves in New Jersey), and the WorldCom sales office (Indiana) which obtained the Number for Eisemann. But the district court did *not* find the actions of the Indiana sales agent part and parcel of WorldCom's unfair or deceptive conduct.[15] Moreover, as we have noted, the first *Bushkin* factor is the least weighty. Finally, the location of Surrette and Reeves is insufficient to overcome the competing evidence which must be weighed under the other *Bushkin* factors— including Levosky's receipt of the results of

---

**14.** Although *Bushkin* construed the operative language—"primarily and substantially"—in the context of Mass. Gen. Laws ch. 93A, § 3(1)(b)(i), as appearing in St.1967, c. 813, *see Clinton Hosp.*, 907 F.2d at 1264, ch. 93A, § 11 uses the identical language. *See id.* Accordingly, we have applied the *Bushkin* factors to § 11 as well. *See id.; see also Roche*, 109 F.3d at 829–31 (referring to "*Clinton Hospital* factors").

**15.** Similarly, WorldCom's Indiana agent would not have been able to assign the Number to Eisemann had WorldCom's Massachusetts employees followed through on the commitment to Play Time. *See supra* p. 26 (Indiana agent able to obtain the Number only because Revere agents failed to enter Play Time's order in computer).

the Surrette and Reeves "investigation" in Massachusetts—all of which indicates that the unfair and deceptive behavior took place primarily and substantially within Massachusetts. Thus, WorldCom failed to carry its burden of proving that the Chapter 93A claim was not actionable.

## III

### *CONCLUSION*

As we conclude that all contentions raised by WorldCom on appeal were waived or meritless, the district court judgment is *affirmed.* Costs are awarded to Play Time.

*SO ORDERED.*