USCA1 Opinion

 

 United States Court of Appeals For the First CircuitNo. 98-1744 FHS PROPERTIES LIMITED PARTNERSHIP, ETC., Plaintiff, Appellee, v. BC ASSOCIATES, ET AL., Defendants, Appellants. APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Morris E. Lasker, Senior U.S. District Judge] Before Selya, Circuit Judge, Cyr, Senior Circuit Judge, and Stahl, Circuit Judge.     John D. Donovan, Jr., with whom Randall W. Bodner, Brian G.Murphy, and Ropes & Gray, were on brief for appellants. Mitchell H. Kaplan, with whom Thomas F. Maffei, RobertDiAdamo, and Choate, Hall & Stewart, were on brief for appellee.April 29, 1999   STAHL, Circuit Judge. In this diversity case,defendants-appellants BC Associates, et al. ("appellants") appeala final judgment of the district court, issued in part on a juryverdict and in part as a matter of law. Appellants also challengethe court's denial of their motion for a new trial on damages. Wereverse the district court's judgment as a matter of law and affirmthe court's denial of the motion for a new trial. I. Facts On appeal, two partners dispute whether a 1991 settlementpayment made to third parties by one of the partners should becharacterized under the partnership agreements as a "Deficit Loan"or as an indemnification obligation. Insofar as appellants arechallenging the judgment entered against them as a matter of law bythe district court, we view the evidence in the light mostfavorable to them. See Gibson v. City of Cranston, 37 F.3d 731,733 (1st Cir. 1994). But insofar as they are challenging thejury's verdict, we view the evidence in the light most favorable tothe verdict. See Dichner v. Liberty Travel, 141 F.3d 24, 27 (1stCir. 1998). Defendants BCA-1 and BCA-2 (together "BCA") andplaintiff-appellee FHS Properties Limited Partnership ("FHS"), arerespectively the managing partners and sole other general partnerof two partnerships that developed and now own International Place,a two-tower office complex in downtown Boston. FHS has a sixty-percent interest in the two partnerships. BCA has a forty-percentinterest. The partners envisioned developing the complex in twodistinct phases and therefore formed Fort Hill Square Associates("Partnership 1") to develop Phase 1 of the project and Fort HillSquare Phase 2 Associates ("Partnership 2") to develop Phase 2. The partners signed two partnership agreements ("PartnershipAgreements"), essentially identical in their terms, which providedthat the agreements would be construed in accordance withMassachusetts law. Phase 1 of the project was initially financed through aconstruction loan from Bank of Boston. When construction wascomplete, the construction loan was "taken out" and replaced withpermanent financing by Teachers' Insurance and Annuity Association("TIAA"). When the partners decided to proceed with Phase 2, Bankof Boston again agreed to finance the construction, subject to apermanent "take out" commitment from TIAA. The second constructionloan was secured by all of the partnerships' assets, including amortgage on Phase 1. Notwithstanding its security interest, Bankof Boston, in May 1990, approved a plan to distribute $15 millionof partnership cash to the partners on three future distributiondates, provided that certain conditions were satisfied on thosedates. The settlement obligation at issue in this case arose inJanuary 1991, when two entities, who were then limited partners ofBCA-1 and who shared an interest in Phase 1 but not Phase 2 of theproject, sued defendants Partnership 1, BCA-1, FHS, DonaldChiofaro, Theodore Oatis, Bank of Boston, and TIAA, claiming thatthe general partners of BCA-1 had misused partnership assets bypledging them as security for the construction of Phase 2 (the"Dimeo" suit). The initiation of the suit distressed thepartnerships' lenders. Bank of Boston sought an assurance fromTIAA that notwithstanding the pendency of the suit, it would honorits promise to pay off the bank's construction loan and replace itwith permanent financing once Phase 2 was complete. TIAA refusedto give such an assurance. Bank of Boston responded by threateningto cease financing Phase 2 construction and insisted that thepartnerships sign a "Forbearance Agreement," which became effectiveon March 14, 1991. That agreement stated that it would be an eventof default under the construction loan if the Dimeo suit was notsettled by April 15, 1991; and pending the April 15 deadline, thebank would finance only fifty percent of the requisitions madeunder the loan agreement, forcing the partnerships to cover thebalance from other funds, which could potentially include the $15million earmarked for distribution. Not surprisingly, BCA and FHS jointly worked to resolvethe Dimeo suit by the April 15 deadline. They negotiated onmultiple occasions with the Dimeo plaintiffs' lawyers and met withBank of Boston and TIAA in an effort either to borrow funds withwhich to settle the suit or to eliminate the terms of theForbearance Agreement. On each occasion, the lenders refused tolend the necessary money or to change the terms of the ForbearanceAgreement. On April 12, 1991, the last business day before thebank's deadline, BCA and FHS reached an oral agreement with theDimeo plaintiffs to settle the suit for $5.6 million. Payment wasdue in one week, on April 19. The partners promptly informed Bankof Boston and TIAA that the case had been resolved.  On April 18, however, FHS informed BCA, by notice toBCA's general partner Chiofaro, that BCA was forbidden from usingPartnership 1 or Partnership 2 funds to satisfy the settlement, andthreatened to remove BCA as managing general partner should it doso. FHS added that it would notify Bank of Boston and TIAA of itsposition. According to FHS, partnership funds could not be used topay the settlement because the settlement was solely BCA'sobligation. After deliberating through the evening of April 18,Chiofaro decided on the morning of April 19 to use only BCA fundsto pay the settlement. That day, he paid the Dimeo plaintiffs$5.6 million. In return, the Dimeo plaintiffs forfeited to BCAtheir small, indirect equity interests in Phase 1, represented bythe limited partnership interests in BCA-1.  Section 5.2 of the Partnership Agreements permits apartner to lend the partnerships certain amounts as "Deficit Loans"if four conditions are met: (1) there must exist a "financialrequirement" of the partnership, that (2) "cannot . . . reasonablybe satisfied from partnership capital, additional capital,financing proceeds, revenues and other partnership moneys," (3)"the parties [have] use[d] their best efforts to obtain reasonablenon-recourse institutional financing . . . of the required amounts"but have been unable to "obtain such financing," and (4) a partnerhas "elect[ed] . . . in its sole discretion" to loan thepartnership the necessary funds." In November 1991, some sixmonths after satisfying the Dimeo settlement, BCA sent a letter toFHS, asserting that its settlement payment constituted a "DeficitLoan," accruing interest at 18%. FHS responded that no suchDeficit Loan had been made, and that BCA was not entitled toindemnification for any part of the $5.6 million payment. FHS thenfiled the instant action seeking a declaration that neitherPartnership 1 nor Partnership 2 owed any sum to BCA. II. Prior Proceedings The parties tried the case to a jury over twelve daysbeginning October 14, 1997. Although denominated defendants,appellants assumed the burden of proof and proceeded through trialeffectively as plaintiffs. Upon the close of appellants' evidence,FHS moved for judgment as a matter of law on the Deficit Loanissue, contending that the second requirement of Section 5.2 hadnot been met because "[t]here can be no question before the jurythat the partnership[s] had money with which to pay thisobligation." The court reserved ruling on the motion and submittedthe question to the jury. The district court also instructed thejury on damages, advising that damages should reflect the $5.6million settlement payment made by BCA, less the value of anybenefits obtained by it, including the limited partnershipinterests in Phase 1 obtained in the settlement and the value, ifany, of the release from the lawsuit. Appellants did not object tothis instruction.  After deliberation, the jury answered specialinterrogatories establishing that appellants had proved each of thefour conjunctive elements for a "Deficit Loan;" and alternatively,that appellants were entitled to be indemnified by the partnershipsfor the settlement payment. Following the return of the specialverdict, the court gave a number of additional instructions ondamages. In the end, the jury returned a verdict establishingappellants' damages at $2.1 million. Following the jury's verdict, FHS renewed its motion forjudgment as a matter of law and appellants filed a motion for a newtrial on damages. The court, on May 13, 1998, entered finaljudgment, ruling that a Deficit Loan did not exist under thepartnership agreements as a matter of law and that appellants wereonly entitled to indemnification. According to the court, "thefacts established at trial show that the Dimeo suit couldreasonably have been paid from partnership funds." Additionally,the court denied appellants' motion for a new trial. In the end,the court entered judgment awarding appellants indemnificationpayments in the amount of $2.1 million accruing interest at 6% perannum. By contrast, as a Deficit Loan, the amount the partnershipsowed appellants would have accrued interest at 18% per annum.  Appellants appeal both the judgment as a matter of lawand the denial of their motion for a new trial.  III. Discussion A. Judgment as a Matter of Law We review a district court's granting of judgment as amatter of law de novo. See Correa v. Hospital San Francisco, 69F.3d 1184, 1191 (1st Cir. 1995). "A judgment as a matter of lawmay be granted only if the evidence, viewed from the perspectivemost favorable to the nonmovant, is so one-sided that the movant isplainly entitled to judgment, for reasonable minds could not differas to the outcome." Gibson, 37 F.3d at 735. In considering theevidence, we, like the district court, "cannot evaluate thecredibility of witnesses, resolve conflicts in testimony, orevaluate the weight of evidence." Criado v. IBM Corp., 145 F.3d437, 441 (1st Cir. 1998) (citation and internal quotation marksomitted).  During trial, appellants contended that the partnerships'admittedly plentiful funds were not reasonably available to pay theDimeo settlement because of restrictions imposed by the loanagreements. Appellants also argued that FHS's refusal to permitBCA to use partnership funds further hindered these funds frombeing reasonably available.  The court, however, rejected these theories as a matterof law because it regarded as undisputed two facts: (1) Bank ofBoston had permitted Partnership 1 to distribute up to $15 millionto the partners and this money could have been used to fund thesettlement; and (2) Chiofaro's and Oatis's testimony that beforeFHS's objection on April 18, 1991, they intended to pay thesettlement from partnership funds without obtaining bank approvaldemonstrated that loan restrictions did not hinder the use offunds. The court additionally found that FHS's refusal to permitthe use of partnership funds was irrelevant because BCA, asmanaging general partner, had the authority to settle the lawsuitwith partnership funds regardless of FHS's position. Reviewing the record in the light most favorable toappellants, we disagree with the district court's assessment of theevidence as undisputed. In our view, the jury verdict wasadequately supported by appellants' evidence that partnership fundswere not reasonably available because of loan restrictions andFHS's lack of cooperation. The partnerships' loan documentsprovided that all of the partnerships' assets served as collateralfor the construction loan. Specifically, section 14(c) of theConstruction Loan Agreement and the related Pledge and EscrowAgreement of Cash Account stated that Bank of Boston had a securityinterest in all of the partnerships' assets and that neitherpartnership could apply funds for any purpose without bank consent. Witness testimony further supported this documentary evidence:Chiofaro and Oatis testified that funds could not be used to paythe settlement without bank permission, which was not forthcoming;and Coleman Benedict, an FHS representative, testified that thepartnerships did not have enough free cash to fund the settlement. It is true that Bank of Boston authorized thedisbursement of $15 million to the partners, but appellantsintroduced evidence that these funds were not reasonably availableto pay the Dimeo settlement. Fifteen million dollars had beenearmarked for distribution on three dates: $8 million on June 5,1990, $3 million six months thereafter, and $4 million six monthsthereafter. According to loan documents and Oatis's testimony,these earmarked funds could not be distributed without bankapproval on each disbursement date. Moreover, according to Oatis,the earmarked funds were not sufficient on April 19, 1991 to paythe $5.6 million settlement. Eight million dollars had alreadybeen distributed to the partners as of the first release date andtherefore were no longer part of the partnership assets. The next$3 million were not distributed on the scheduled seconddisbursement date because that amount had been used to fund fiftypercent of the Phase 2 construction expenses during the pendency ofthe Forbearance Agreement. Finally, the last $4 million wereearmarked for distribution in May 1991, after the settlementpayment was due. While BCA theoretically could have used the $4million in anticipation of the forthcoming release date, the jurycould have found that FHS's threats, as well as uncertaintyregarding the bank's required consent, rendered the funds notreasonably available on April 19, 1991. In all events, simplearithmetic proves that $4 million is not $5.6 million. We also disagree with the district court's decision thatChiofaro's and Oatis's testimony that they had initially intendedto pay the settlement from partnership funds without obtaining bankapproval is conclusive evidence that bank restrictions did notencumber partnership funds. While such testimony tends to provethat partnership funds were reasonably available, it is notconclusive evidence on this point. The jury could have creditedOatis's testimony that he did not intend to obtain bank permissionbefore April 19 because it was not until that date that he realizedthe distribution of funds necessary for payment could not occurwithout FHS's cooperation.  The testimony introduced at trial therefore sufficientlysupported the jury's finding that funds were not reasonablyavailable to settle the Dimeo suit on April 19, 1991. Under thesecircumstances, the district court erred in ruling as a matter oflaw that the conditions for a Deficit Loan had not been met. Thus,we reverse the court's judgment as a matter of law, reinstate thejury's finding that the conditions for a Deficit Loan were met, andremand so that judgment may be entered in accordance with thisopinion.  B. Motion for New Trial Appellants also challenge the district court's refusal togrant a new trial on damages, contending that the court'sinstructions to the jury on damages were erroneous andalternatively, that the jury's valuation of their damages at only$2.1 million is not supported by the evidence. We review thecourt's denial of a motion for a new trial for an abuse ofdiscretion. See Air Safety v. Roman Catholic Archbishop of Boston,94 F.3d 1, 4 (1st Cir. 1996). According to appellants, the district court erred ininstructing the jury that it could deduct the value of the limitedpartners' release from its base damages when there was no evidenceof the value of the release in the record. See Kelliher v. GeneralTransp. Serv., Inc., 29 F.3d 750, 754 (1st Cir. 1994) (juryinstruction may not be given if there is insufficient evidence tosupport it).  Appellants, however, did not preserve this argument forappeal. Fed. R. Civ. P. 51 states, in relevant part, that "[n]oparty may assign as error the giving or the failure to give aninstruction unless the party objects thereto before the juryretires to consider its verdict, stating distinctly the matterobjected to and the grounds of the objection."  Although appellants contend that they objected to thejury instruction and further submission of the issue, we have beenunable to discern any such objection. Rather, our reading of therecord indicates that appellants failed to object when the court,at the close of the evidence, instructed the jury:  In calculating damages, I instruct you that the base figure on which your calculation is made is the 5.6 million paid to settle the suit. From that amount, you should deduct the value, if any, of the assets which you find that Chiofaro purchased from [the limited partners] in settlement of the suit, that is, what you find to be the value, again, if any, of the 22« percent interest in the BCA[-1] partnership, as well as the value of the release given Chiofaro by [the limited partners].Appellants also failed to object when the jury, after a period ofdeliberation, requested by note that the court "supply parameters'for the value of the release.'" Appellants' assertion that duringa resulting lobby conference, they "stated that there existed notestimony in the record as to the value of the release [and]objected to additional instruction concerning the value of therelease and to further submission of the issue to the jury"misstates the record. During the lobby conference, the court askedthe parties whether there was testimony on the value of thereleases. Counsel for appellants responded: "The only testimony,I believe, was opinion testimony on the value of the interest. Sosubtraction works, but I think that's unfair." Counsel did not,however, object to the court's instructing the jury to subtract thevalue of the release from the $5.6 million base figure. Rather,the only so-called objection noted by counsel at that time was"[y]ou've got to repeat your [earlier] instruction and say theevidence is the evidence." These comments, together, fall short ofRule 51's requirement that the objection "stat[e] distinctly thematter objected to and the grounds of the objection." Absent a timely objection, an erroneous jury instructionwarrants a new trial only where the assigned error "'caused amiscarriage of justice or . . . undermined the integrity of thejudicial process.'" Play Time, Inc. v. LDDS MetromediaCommunications, Inc., 123 F.3d 23, 29 (1st Cir. 1997) (quotingScarfo v. Cabletron Sys., Inc., 54 F.3d 931, 940 (1st Cir. 1995)). We see no miscarriage of justice here and therefore hold thatappellants have waived their objection to the jury instruction. See, e.g., Play Time, 123 F.3d at 30, n.8 (no miscarriage ofjustice where the issue "implicates only the question of damagesfor breach of a private agreement between the litigants;" and nodamage to integrity of the judicial process where "the proceedingsbelow were conducted with meticulous attention to the rights ofboth parties"). Appellants also make the argument that even if the valueof the release played no role in the jury's reduction of itsrecovery so that the $3.5 million reduction represents the valueof limited partnership interests only they are still entitled toa new trial on damages because the jury's valuation is notsupported by the record. In challenging the jury's damage award,appellants face a daunting task. Our review "is limited toexamining whether evidence in the record supports the verdict. Ifthe jury award has a rational basis in evidence, we must affirmit." Air Safety, 94 F.3d at 4 (citation and internal quotationmarks omitted). "While 'the jury may not render a verdict based onspeculation or guesswork,' a reviewing court will not tinker withthe jury's assessment of money damages as long as it does not falloutside the broad universe of theoretically possible awards thatcan be said to be supported by the evidence." Dopp v. Pritzker, 38F.3d 1239, 1249 (1st Cir. 1994) (citation omitted). In the end,"[w]e will not disturb an award of damages for economic lossprovided it does not violate the conscience of the court or strikesuch a dissonant chord that justice would be denied were thejudgment permitted to stand." Vera-Lozano v. Int'l Broadcasting,50 F.3d 67, 71 (1st Cir. 1995) (citation and internal quotationmarks omitted).  Here, the jury's valuation of the limited partnershipinterests falls within the broad universe of awards supported bythe evidence. Together, the limited partners had a 22.5% interestin BCA-1, which in turn had a 40% interest in Phase 1. Thus, thelimited partners had a 9% interest in Phase 1. Oatis testifiedduring trial that, in 1989, he prepared for FHS a valuation ofPhase 1 for $150 to $200 million. Using the 9% figure, the limitedpartnership interests in this amount would have been $13 to $18million. Francis McCarthy, former comptroller of Chiofaro Company,one of Chiofaro's interests, testified that, some time after August1990, Chiofaro asked him to calculate certain tax consequences ofacquiring one of the limited partner's interest at purchase pricesranging from $1.96 to $4 million. The jury could have determinedthat this testimony reflected a proper valuation of one of thelimited partner's interest. Appellants themselves introduced intoevidence a letter from Richard Renehan, lead trial counsel fordefendants in Dimeo, to Earl Cooley, counsel for plaintiffs,stating that defendants were "prepared to buy your clients out forcash at the fair market value of their interests" and offering $1.6million. Kevin Currier, the Chief Financial Officer of DimeoConstruction Company ("Dimeo"), a limited partner with a 20%interest in BCA-1, testified that, based on this letter, he valuedthe sale of Dimeo's interest at $1.5 million on Dimeo's 1991 taxreturn (and the IRS challenged this valuation as insufficient). Finally, Coleman Benedict testified that during settlementnegotiations he discussed with Chiofaro the limited partners'interest at values ranging from zero to $15 million, depending on"assumptions you used about the condition of the market in thefuture." Based on the sum of this evidence, the jury could havereasonably valued the limited partnership interests in BCA-1 at$3.5 million. We will not second-guess its decision to do so. IV. Conclusion For the foregoing reasons, we reverse the decision of thedistrict court in part and affirm in part. No costs.